### George McCann

*v.*

### The People of the State of Illinois.

*Opinion filed April 18, 1907.*

1. Criminal law—*when statement of co-defendant is admissible.* A statement made out of court by one of two men on trial for murder, to the effect that he was present and saw his co-defendant do the shooting, is admissible against the declarant as identifying him as one of the persons present at the shooting; and its admission in evidence over the objection of the co-defendant is not error, where the objection went to the entire statement and not to that part, only, which tended to incriminate the co-defendant, and where the statement was admitted against the declarant alone and the jury were instructed not to consider it against his co-defendant.

2. Same—*when alleged error in admitting evidence is cured.* Alleged error in admitting in evidence, as part of the case in chief, a statement made out of court by one of two men on trial for murder, which was to the effect that the declarant was present and saw his co-defendant do the shooting, is cured where the declarant subsequently took the stand and testified at variance with such statement, thus rendering the latter competent for the purpose of impeachment.

3. Same—*allowance of leading questions largely discretionary.* The allowance of leading questions calling the attention of the witness to the subject matter with reference to which his testimony is desired rests largely in the discretion of the trial court, and will not call for a reversal in the absence of a clear abuse of discretion.

4. Appeals and Errors—*when question of propriety of counsel's remarks is not preserved for review.* The question of the propriety of the remarks of counsel before the jury is not preserved for review where there is no exception taken to any ruling of the court or a refusal to rule as to such remarks.

Cartwright and Vickers, JJ., dissenting.

Writ of Error to the Criminal Court of Cook county; the Hon. George A. Dupuy, Judge, presiding.

The grand jury of Cook county, at the January term, 1906, returned into the criminal court of said county an indictment charging Philip McEwen, George McEwen and George McCann with the murder of one William Bielski on January 24, 1906. George McEwen was not apprehended, Philip McEwen was acquitted and George McCann was convicted, and after overruling motions for a new trial and in arrest of judgment the court sentenced said George McCann, upon the verdict, to the penitentiary for his natural life, and he has sued out a writ of error from this court to review said judgment of conviction.

William Bielski opened a saloon at 3301 Halsted street, in the city of Chicago, on or about the 14th day of January, 1906. The saloon was in the front part of the building, which was reached from the street by a door which entered the saloon proper through a vestibule, in which was located a cigar stand, and which vestibule was separated from the saloon by swinging glass doors. The bar extended along the south side of the saloon and the water-closet and ice-box were located in the rear of the saloon, and in the rear of the room in which the saloon was located were the living rooms of the father and mother of William Bielski,

with whom he and his sister, Mary, and a relative of his
father, made their home. On the afternoon of January 24,
at about the hour of three o'clock, George McEwen, Philip
McEwen and George McCann entered the saloon. The evi-
dence tends to show George McEwen and George McCann
entered first and that Philip McEwen soon followed them.
At the time they entered the saloon Mary Bielski, the sister
of William Bielski, who was about thirteen years of age,
was in the saloon alone and was behind the bar and William
Bielski was asleep in a room immediately in the rear of the
saloon. Mary Bielski served the three men with drinks and
they called for the dice box and commenced throwing dice.
At that time Mary Bielski called William Bielski, who put
on his shoes and came into the saloon. He and the three
men threw dice for a time, afterwards played cards, and
again threw dice for money. They also drank more or less
beer during the afternoon and evening. Only a few people
came into the saloon during the afternoon and evening, and
the four men continued to throw dice, play cards and drink
until about ten o'clock at night. William Bielski kept his
money in a cash register, which stood upon a counter which
was placed against a wall in the rear of the bar, and in a
cigar box which was kept beneath the bar. A loaded re-
volver was lying on the counter near the cash register. The
three men appear to have been strangers to William Bielski.
They were at least unknown to Mary Bielski. She testified
that at about ten o'clock, while George and Philip McEwen
and William Bielski were standing at the bar throwing dice,
George McCann went behind the bar, or reached over the
bar, and seized the revolver near the cash register and
pointed it at William Bielski and told him to throw up his
hands; that she said to McCann to take the money but not
to kill her brother; that George McCann thereupon seized
the cigar box that contained the money and then shot Wil-
liam Bielski, and that all three of the men then took hold
of him and pulled or carried him toward the door; that

she started to run from the room and that Philip McEwen caught her by the hair and held her; that she was very much frightened and fell down; that she finally got away from Philip McEwen and ran into the living rooms of her parents in the rear of the saloon.

The evidence shows there were three shots fired. A shoemaker by the name of Abraham Solomon, whose shop was located across the street from the saloon, testified that about ten o'clock on the night of the 24th of January he heard a shot fired in the saloon of William Bielski; that almost instantly two men, which the evidence shows to have been George McEwen and George McCann, came out of the front door of the saloon; that as they reached the door of the saloon George McCann turned around and fired two shots into the saloon; that they then started north on Halsted street; that William Bielski followed them to the front door, when he fell down upon the sidewalk; that he went to William Bielski and when he reached him he was dead. William Bielski died from a revolver shot in his left breast. The bullet passed through his body and lodged in the arm pit beneath the right arm. The evidence shows that immediately after William Bielski was shot the cigar box from beneath the bar, which contained about $50, and the revolver, which had been lying on the counter near the cash register, were gone from their accustomed places and were never found, and no revolver was found upon the person or near William Bielski or in the saloon when the body of William Bielski was removed from the street.

George McCann was arrested at his home on Cottage Grove avenue on the next evening. He denied he was present in the saloon or had anything to do with the killing of William Bielski, and stated to the police officers he could establish an *alibi*. On the trial he admitted he was present in the saloon on the afternoon and evening of January 24, and testified that he became involved in a quarrel with William Bielski over a game of dice, and stated that

he seized the money up on the game and stated to William Bielski that he had been cheated; that William Bielski stooped down beneath the bar as if to obtain a club; that he reached over the bar and seized the revolver on the counter near the cash register; that he attempted to leave the saloon; that William Bielski, as he was leaving the saloon, shot at him twice; that the first shot passed through his hat and wounded him on the head and that the second shot severed the pin from his necktie; that William Bielski followed him out on the street, and that after he had reached the street he returned the fire, and if he shot William Bielski it was done in self-defense.

Philip McEwen made a statement to the police officers, which was reduced to writing on January 26, admitting he was present in the saloon at the time William Bielski was shot, which statement corresponded with the testimony of Mary Bielski as to the manner in which William Bielski was killed. He, however, testified upon the trial that George McCann and William Bielski became involved in a quarrel in the saloon over a game of dice; that William Bielski stooped down as though to get something from beneath the bar; that George McCann seized the money lying upon the counter which was up on the game and reached over the bar and got hold of the revolver lying near the cash register; that he saw there was going to be trouble between William Bielski and George McCann, and that he ran out of the saloon without stopping to get his overcoat and ran away from the building, and that he was not present when William Bielski was killed.

NINIAN H. WELCH, and WILLIAM S. WELCH, for plaintiff in error.

W. H. STEAD, Attorney General, and JOHN J. HEALY, State's Attorney, (JAMES J. BARBOUR, of counsel,) for the People.

Mr. Justice Hand delivered the opinion of the court:

It is first contended that the evidence is insufficient to sustain the judgment. The evidence clearly shows that George McCann was present in the saloon of William Bielski on the afternoon and evening of January 24, 1906, and that he fired the shot which caused the death of William Bielski, and the only question that is open to discussion upon this record as to the guilt of George McCann is, did he take the life of William Bielski with intent to commit murder or did he take his life in self-defense? Mary Bielski testified that he went behind the bar or reached over the bar and took the revolver and pointed it towards William Bielski and told him to hold up his hands, and then shot him. Abraham Solomon testified he heard one shot fired in the saloon and that he saw George McCann and George McEwen come out of the saloon, and as George McCann came out of the door he turned around and fired two shots into the saloon, and that William Bielski immediately appeared in the doorway and fell out upon the sidewalk, dead. There was but one revolver present at the time of the shooting, which was the revolver of William Bielski but which was in the hands of George McCann. The cigar box containing the money was gone after the three men left the saloon, and Mary Bielski testified George McCann took it when he left. When arrested George McCann denied he was at the saloon or that he had anything to do with the killing of William Bielski. He afterwards admitted he was present and shot at William Bielski, and claimed if he killed him he did so in self-defense. He pointed out to the officer, the second day after the killing, a hole in his hat and a wound upon his head which he claimed were caused by a shot fired at him by William Bielski just as he was leaving the saloon. The officer testified he examined the wound, and that it was an old one and one which was substantially healed. If the evidence of the People is to be believed,

clearly the plaintiff in error was guilty of murder. That testimony was denied only by the plaintiff in error and Philip McEwen. It was a question for the jury to determine where the truth lay, and they having found the plaintiff in error guilty, we are not disposed to set their verdict aside for want of evidence to sustain the same. We think the verdict of the jury could not have been otherwise than what it was, in view of all the evidence found in this record.

It is next urged the court erred in admitting in evidence, as against plaintiff in error, the following statement made by Philip McEwen to the police officers after his arrest:

"I, Philip McEwen, hereby freely and voluntarily make the following statement: My name is Philip McEwen, and I live at 2839 Emerald avenue, Chicago. On Sunday, January 21, 1906, I fell down a step and strained my shoulder and did not go out of the house until Tuesday P. M. On Tuesday P. M. I went over to McCann's house, at 3817 Cottage Grove avenue, and slept there that night with McCann. The next morning, Wednesday, January 24, I got up about eleven o'clock and stayed around the house until three o'clock P. M., when McCann and I went over to my brother's house, and from there went with my brother, George, and George McCann, to the saloon on the south-west corner of Thirty-third and Halsted streets, Chicago. We got to the saloon about half-past five o'clock, and my brother, McCann and myself and the bar-tender stood shaking dice until about half-past nine o'clock, when all of a sudden I saw McCann step behind the bar and pick up a revolver which was lying on the counter near the cash register, and McCann said to the bar-tender, 'Throw up your hands!' When I saw it was serious I grabbed my coat and started to run out of the place. Just as I got to the door I heard three shots, and kept on running over to the gas house, on Archer avenue, and took a Cottage Grove avenue car to 3817 Cottage Grove avenue and went to McCann's house. McCann came in about five minutes afterwards and my brother came in shortly after McCann, and I said to McCann: 'What did you make such a fool of yourself for?' and he laughed. He told me that all he got from the cash register at Thirty-third and Halsted was seven dollars. He said he had his necktie pin shot off and he was out on the deal. My brother and I then left McCann's place and I went on my way home, and my brother went in a saloon and followed me home shortly afterwards. The above statement is true and correct, and is made by me without any threat, promise, fear or inducement of any kind whatsoever."

The court, at the time the statement was admitted in evidence, stated orally to the jury, upon the request of the State's attorney as well as upon the request of the attorneys for the defense, that the statement was only admitted as against Philip McEwen and that it was not evidence against and would not bind George McCann, and afterwards gave to the jury upon that question the following instruction in writing:

"The court instructs the jury that the statement made by Philip McEwen, and introduced as evidence in this case, is not in any sense evidence against the defendant George McCann, and so far as George McCann is concerned said statement must be entirely disregarded by the jury."

The statement was admitted in evidence as a part of the People's case in chief and before Philip McEwen had testified as a witness. George McEwen, Philip McEwen and George McCann were strangers to all the persons who saw them at William Bielski's saloon on the afternoon and evening of the killing. George McEwen had fled, and Philip McEwen and George McCann were on trial together charged with the murder of William Bielski. It was necessary, in order to make a case against the defendant Philip McEwen, that the People should identify him as being one of the persons who were present at the saloon at the time William Bielski was shot. In the first part of the written statement of Philip McEwen he admitted he was present in the afternoon and evening on the occasion of the shooting. The objection of the plaintiff in error to the admission of said statement went to the entire statement, and not to that part, only, which tended to incriminate the plaintiff in error. Had the objection been limited to the part of the statement which tended to incriminate the plaintiff in error the objection would doubtless have been sustained. The statement, so far as it showed Philip McEwen was present at the time of the shooting, was clearly admissible, and as the objection was not limited to that part of the statement which tended

to incriminate the plaintiff in error, we think the objection was properly overruled. After the People had closed their evidence Philip McEwen was called as a witness by George McCann and testified fully as to what took place in the saloon during the afternoon and evening of January 24. His testimony upon the witness stand did not agree with the statement which he made to the police officers and which had been admitted in evidence. It was competent, therefore, to introduce such statement for the purpose of the impeachment of Philip McEwen. And even if it was error to admit it as a part of the People's case in chief, it became competent after Philip McEwen had testified as a witness in the case, and the error, if any, committed in admitting the statement at the time it was admitted, was cured after Philip McEwen had testified as a witness in the case. The statement was admitted as against Philip McEwen alone, and as the jury were instructed it should not be considered as evidence against the plaintiff in error, there was no error in admitting such statement in evidence. *Ackerson* v. *People;* 124 Ill. 563.

It is further urged the State's attorney made improper and prejudicial remarks in the presence of the jury during the cross-examination of the plaintiff in error. The record upon the subject complained of is as follows: The State's attorney was cross-examining the plaintiff in error as to what he had referred to as a bullet hole in his hat and a wound upon his head, when the following occurred:

Q. "Isn't it a fact that you received that shot while you were engaged in some other hold-up?

Mr. Welch: "I object to that.

The court: "No, it has been answered.

The witness: "Never in a hold-up in my life.

Mr. Welch: "I shall take exception to that question.

Mr. Barbour: 'I move it be stricken out unless I can go into the hold-up business. It is not responsive.

The court: "Do you wish to have it stricken out?

Mr. Welch: "I just want to preserve my exception.

The court: "Do you wish to have it stricken out?

Mr. Welch: "No, I don't care to have it stricken out. I want to preserve my exception.

The court: "It may stand.

Mr. Welch: "Is the court overruling the objection?

The court: "The court did not make a ruling. I wanted to know whether he wanted it stricken.

Mr. Welch: "I want it stricken out.

The court: "It may be stricken out."

It will be observed that the court made no ruling and no exceptions were taken as to any ruling of the court or the refusal of the court to rule. There is therefore no question as to the propriety of the remark of the State's attorney preserved for review in this court. (*North Chicago Street Railroad Co.* v. *Leonard,* 167 Ill. 618; *City of Salem* v. *Webster,* 192 id. 369.) In the *Webster case,* on page 376, the court said: "A party litigant * * * can only complain where he has objected and obtained a ruling and excepted to it, or excepted to a refusal of the court to act." The plaintiff in error, while upon the witness stand, admitted, upon his direct examination, in reply to questions propounded to him by his own attorney, that he had been in the reform school and the penitentiary twice, and in view of the fact that the evidence was of such a character that the jury could not have found differently than they did, we are of the opinion that, even though an exception had been preserved to the remark of the State's attorney, the case ought not to be reversed on account thereof. *Jennings* v. *People,* 189 Ill. 320.

It is finally urged that the court erred in permitting the State's attorney to ask Mary Bielski leading questions. She was inquired of, what George McCann had in his hands at or about the time he shot her brother, and she answered, a revolver. She was asked if he had anything else in his hands at that time, and she said, no. The State's attorney

then said, "Well, I have asked you about some money," whereupon she said, "I forgot to tell that," and then went on to relate what she saw and knew upon that subject. The witness did not understand the English language very well, was only about thirteen or fourteen years of age, and was, in the very nature of things, more or less embarrassed or confused while upon the stand. In *Maguire* v. *People*, 219 Ill. 16, it was held that the allowance of leading questions rests largely in the discretion of the trial court, and that the allowance of such questions should not work a reversal unless there was a palpable abuse of the discretion reposed in the trial court. We do not think the court erred in permitting the State's attorney to call the attention of the witness to the subject matter about which he wished her to testify.

We have examined this record with care and are of the opinion the conviction of the plaintiff in error was fully justified by the evidence, and that no error was committed upon the trial which would justify this court in reversing the judgment of conviction. The judgment of the criminal court will therefore be affirmed.          *Judgment affirmed.*

Vickers and Cartwright, JJ., dissenting:

We do not concur in the foregoing opinion. We are of the opinion that the statement of Philip McEwen, a copy of which appears in the opinion of the court, was erroneously admitted in evidence against plaintiff in error, and that this error is not cured by the oral statement of the trial court limiting its application to McEwen, or by the instruction directing the jury that they could only consider such statement as against McEwen. If such statement could be regarded as a confession or an admission against the interests of McEwen, its admission would not be error when its application was properly limited to the author of the statement. But this statement was not a confession. There is nothing in it which directly or impliedly connects McEwen

with the commission of the crime charged. A confession is not equivalent to a statement or a declaration. A confession, in its legal sense, means an acknowledgment of guilt. (1 Greenleaf on Evidence, sec. 170; 8 Cyc. 562; *Johnson* v. *People,* 197 Ill. 48; *Michaels* v. *People,* 208 id. 603.) A careful reading of McEwen's statement will disclose that it has none of the elements of a confession in it. Instead of admitting his participation in the offense he asserts his innocence, and states facts which, if believed by the jury, would necessarily result in the conviction of plaintiff in error of murder. We do not think that the ground upon which the opinion of the court justifies the admission of this statement is tenable. It is said by the majority opinion that "it was necessary, in order to make a case against the defendant Philip McEwen, that the People should identify him as being one of the persons who were present at the saloon at the time William Bielski was shot." Certainly the statement implies that Philip McEwen was present, but the record does not show that he ever denied being present, and if he had and this fact was in issue, what would it avail the prosecution to prove that he was present if by the same statement his innocence was established? We doubt if any prosecuting attorney who was in good faith seeking to convict McEwen would ever offer such a statement against him. The statement was highly prejudicial to plaintiff in error, and his conviction and McEwen's acquittal might reasonably be expected to follow with this statement before the jury. It is true that the court stated to the jury that they could only consider such statement with reference to McEwen, and also gave an instruction to the same effect. In view of the character of the statement this did not cure the error. There was nothing in it which could be considered by the jury as against McEwen but very much that was highly prejudicial to McCann, and for that reason the statement should have been excluded entirely from the consideration of the jury, and in our opinion the court com-

mitted reversible error in refusing to so hold. The statement was that Philip McEwen went to the saloon with his brother and plaintiff in error and engaged in shaking dice with them. There is not a sentence in the statement that could have been separated from the rest and given to the jury so as not to affect plaintiff in error. The only possible effect of the statement would be to clear the maker of it and convict plaintiff in error. It certainly did not become competent by reason of McEwen's subsequent contradiction of it.

We are also of the opinion that the conduct of the attorney for the People in the cross-examination of plaintiff in error was highly prejudicial. It is the duty of a public prosecutor to co-operate with the court to enforce the law against the guilty and to see that all persons charged with crime have a fair trial. In making the statement, in the presence of the jury, that certain evidence may go out "if I am not permitted to go into the hold-up business," the prosecutor was guilty of conduct the effect of which was to raise an unfavorable suspicion in the minds of the jurors against the prisoner. The statement clearly implies that if the State was permitted to go into "the hold-up business" the hole in the hat and the scar on the head would be accounted for. An intimation of this character by the prosecuting attorney not only tended to discredit the plaintiff in error as a witness, but was calculated to cause the jury to look upon the plaintiff in error as a professional crook, who had committed other crimes which the rules of law would not permit the attorney to go into. We think the point is saved by the exception taken and that rights of the prisoner were unduly prejudiced in this regard.

We are of the opinion that the prisoner has not had a fair trial in view of these erroneous rulings, and that the judgment below should be reversed and the cause remanded for another trial.