## HALE v. UNITED STATES.

Circuit Court of Appeals, Eighth Circuit.
March 27, 1928.

No. 7810.

1. **Criminal law ⊱101(1)—In prosecution in Western district of Oklahoma, after enactment of statute creating three districts, for abetting murder in Osage county before enactment, motion for transfer to Osage county held properly refused (Comp. St. §§ 1088-1088e; Jud. Code, §§ 40, 59 [28 USCA §§ 101, 121]).**

In prosecution in Western district of Oklahoma after enactment of Act Feb. 16, 1925 (Comp. St. §§ 1088-1088e), creating three districts, for abetting murder committed in Osage county before such enactment, court properly refused motion to transfer case to Osage county, notwithstanding Judicial Code, § 40 (28 USCA § 101), providing for trial of capital offense in county where offense was committed, where that can be done without great inconvenience, since court was without power to transfer to specific county of Northern district, and no application was made under Judicial Code, § 59 (28 USCA § 121), for transfer to Northern district.

2. **Indictment and information ⊱83—Indictment charging that defendant unlawfully aided, abetted, counseled, commanded, and procured another in committing murder held sufficient.**

In prosecution for aiding and abetting in murder, indictment charging that defendant unlawfully, feloniously, willfully, deliberately, maliciously, and premeditatedly, with malice aforethought, did aid, abet, counsel, command, and procure another in so doing and so to do, *held*, sufficient, since particular act by which aiding and abetting was consummated need not be set out.

3. **Criminal law ⊱1167(1)—Overruling demurrer to indictment for abetting murder on ground that more specific statement should be given will not avail defendant in error, unless substantial rights were prejudiced.**

Demurrer to indictment for aiding and abetting in murder, which was overruled, will not avail defendant in error, unless substantial rights were prejudiced by refusal to require more specific statement of particular mode in which offense charged was committed.

4. **Indictment and information ⊱137(3)—Indictment for abetting murder will not be quashed because Special Assistant Attorney General was in grand jury room and took and transcribed testimony (5 USCA § 310).**

Indictment for aiding and abetting in murder will not be quashed because of presence of alleged unauthorized person before grand jury who took and transcribed testimony, where such person was Special Assistant Attorney General, authorized under Act June 30, 1906 (5 USCA § 310), to conduct grand jury proceedings.

5. **Criminal law ⊱80—In prosecution for abetting murder evidence that another than defendant's principal might have committed crime is admissible, where circumstances tend clearly to show him guilty.**

In prosecution for aiding and abetting another in committing murder, evidence showing that another than defendant's principal might have committed crime is admissible, but there must be proof of train of facts or circumstances tending clearly to point out such other as guilty party, and remote facts disconnected and outside of crime itself cannot be separately proved for such purpose.

6. **Criminal law ⊱80—In prosecution for abetting murder, exclusion of testimony that another than defendant's principal was seen near deceased's home and as to his meeting with deceased in pool hall held not reversible error, though it might well have been admitted as showing such person killed deceased.**

In prosecution for aiding and abetting another in committing murder, exclusion of testimony that another than defendant's principal was seen standing near deceased's home and as to meeting between such person and deceased in pool hall, offered to show that such person might have killed deceased, *held* not to constitute reversible error standing alone, though it might well have been admitted, in view of other evidence showing relationship between such person and deceased, since in capital case opportunity should be afforded to present all competent evidence tending to show that party other than accused might have committed crime.

7. **Criminal law ⊱531(2), 1153(6)—Court is vested with discretion in admitting evidence whether confession was voluntary which will not be disturbed save for abuse.**

Court is vested with very large discretion in permitting introduction before jury of evidence as to whether alleged confession was accused was voluntary, which will not be disturbed on appeal, in absence of clear abuse, notwithstanding that admissibility of such statement is not primarily question of fact, but one which court must decide.

8. **Criminal law ⊱622(1)—Granting separate trial is discretionary.**

Granting of separate trial in prosecution for aiding and abetting in murder rests in sound discretion of court.

9. **Criminal law ⊱736(2)—Where court holds confession admissible, question whether it was voluntary may be left to jury on conflicting evidence.**

Where there is conflict of evidence as to whether confession is voluntary if court decides that it is admissible, question whether it is voluntary may be left to jury, with direction that they should reject confession if on whole evidence they are satisfied it was not voluntary.

**10. Criminal law ⬤⟳673(4)—Confession of one accused of murder should be limited in submission to jury to parts tending to incriminate him, where he was tried jointly with aider and abettor.**

Where there was joint trial of one accused of murder and of defendant accused of aiding and abetting, confession of codefendant should be limited in its submission to jury to parts tending to incriminate such codefendant, since it is fundamental that no one can confess for any one but himself.

**11. Criminal law ⬤⟳80—In prosecution for abetting murder, proof must show defendant's principal committed the murder.**

In prosecution for aiding and abetting in committing murder, it is necessary to make proof that defendant's principal committed the murder.

**12. Criminal law ⬤⟳80—In prosecution for abetting murder, confession by defendant's principal that he killed deceased is admissible.**

In prosecution for aiding and abetting in committing murder, confession by defendant's principal held admissible, in so far as it stated that killing was done by him, since it is necessary to make proof that defendant's principal committed the murder.

**13. Criminal law ⬤⟳622(1)—One accused of abetting murder held entitled to separate trial, where principal's confession was not admissible in its entirety against abettor.**

Defendant, accused of aiding and abetting in commission of murder, held entitled to trial separate from that of his principal on murder charge, where latter made confession involving defendant which was not admissible in its entirety as to defendant but was admissible as to principal.

**14. Criminal law ⬤⟳304(17), 719(1)—It is not common knowledge that government officer never lied on witness stand to hang human being and counsel should not so state.**

It is not matter of common knowledge that government officer has never taken witness stand and lied to hang human being, and therefore such statement cannot be made in argument to jury without supporting evidence.

**15. Criminal law ⬤⟳655(5)—Argument that government officer would not lie to hang human being, considered with court's remark that it was probably common knowledge, unduly emphasized government testimony.**

In prosecution for aiding and abetting murder, argument of government's counsel that government officer would not take witness stand and deliberately lie to hang human being held to unduly emphasize testimony of government officers, when taken in connection with remark of court that there was no evidence, "but it is probably within common knowledge."

**16. Criminal law ⬤⟳369(3)—Where witness was inmate of penitentiary, testimony to minimize impeachment cannot charge defendant with another crime.**

Where witness in prosecution for aiding and abetting murder was shown to be confined in penitentiary on murder charge, testimony offered to minimize impeachment by showing that he did not himself participate in killing cannot include introduction of testimony tending to charge defendant with commission of crime entirely independent of that on which he was being tried.

**17. Criminal law ⬤⟳723(1)—Jurors should not be diverted from exercising dispassionate judgment through fear of popular denunciation or hope of popular approval.**

Cases should be tried on evidence presented, and jurors should not be diverted from exercise of dispassionate judgment on merits through fear of popular denunciation or hope of popular approval.

In Error to the District Court of the United States for the Western District of Oklahoma; John C. Pollock, Judge.

William K. Hale was convicted of aiding and abetting another in the murder of a full-blood Osage Indian, and he brings error. Reversed and remanded.

John I. Williamson, of Kansas City, Mo., and J. I. Howard, of Pawhuska, Okl. (William S. Hamilton and Edward C. Gross, both of Pawhuska, Okl., on the brief), for plaintiff in error.

Roy St. Lewis, U. S. Atty., of Oklahoma City, Okl. (O. R. Luhring, Asst. Atty. Gen., and Oliver E. Pagan, Edwin Brown, T. J. Leahy, Horace L. Dyer, and Paul B. Bailey, Sp. Asst. Attys. Gen., on the brief), for the United States.

Before STONE and VAN VALKENBURGH, Circuit Judges, and KENNEDY, District Judge.

VAN VALKENBURGH, Circuit Judge. William K. Hale, plaintiff in error, was indicted, tried, and convicted for aiding and abetting one John Ramsey in the murder of Henry Roan, a full-blood Osage Indian. The murder is alleged to have been committed February 6, 1923, in Osage county, Okl., upon a restricted allotment of one Rose Little Star, a member of the Osage Tribe of Indians. The federal jurisdiction is based upon this locus in quo. Ramsey was indicted and convicted jointly with Hale. He has prosecuted a separate writ of error. The direct testimony connecting Ramsey and Hale with the murder was given by one Ernest Burkhart, a nephew of Hale, now serving a life sentence for complicity in the murder of one W. E. Smith and members of his family. The motive assigned for the murder was, in effect, that plaintiff in error had procured the taking out of a policy of insurance in the sum of $25,000 upon the life of Roan; his claimed interest being an indebtedness of Roan to him for that amount, as evidenced

by a promissory note dated in January, 1921, but claimed by the government to have been made in June of that year, about the time the policy was issued. There was testimony to the effect that Roan had theretofore attempted suicide, and that, when the policy was written, plaintiff in error had displayed interest as to the date on which the policy would become indefeasible on the ground of suicide, fraud in representations made, or for any other cause. He was advised that after one year the policy would be incontestable. He paid two premiums on the policy, whereby it was kept in force for a period of more than one year prior to Roan's death.

For the purposes of this opinion a further recital of facts connected with the murder is deemed unnecessary. Matters governing our decision will appear in connection with a discussion of the errors assigned.

[1] At the threshold, the jurisdiction of the District Court is challenged. At the time the crime was committed, Osage county formed a part of the Western district of Oklahoma. The state was then composed of two judicial districts, the Eastern and Western. An Act of Congress, approved February 16, 1925 (Comp. St. §§ 1088–1088e), created three districts in the state, designated the Eastern, Western, and Northern. The duly created Northern district comprises ten counties, which were formerly a part of the old Eastern district, and two counties, Osage being one, which were formerly a part of the old Western district. With this exception, the new Western district remains as before. The case was tried October 20, 1926, at Oklahoma City, in the Western district. A previous trial at Guthrie, in the same district, in July of the same year, had resulted in a mistrial. At the first trial, as at the second, the defendants jointly moved to transfer said cause for trial to Osage county, Okl., then in the new Northern district of that state. This motion was denied. In order that the effect of this ruling may be better understood, the motion is set out in full:

"Motion of John Ramsey and W. K. Hale to Transfer the Trial of Said Cause as Provided in Section 40 of the Judicial Code (28 USCA § 101).

"Comes now the defendants, John Ramsey and W. K. Hale, and respectfully represent and show to the court that they stand charged by the indictment in this case with the crime of murder which is a capital offense under the laws of the United States, and that the indictment charges that the offense was committed in Osage county, Okl., on or about the 16th day of February, 1923.

Said defendants therefore respectfully pray the court that the trial of said cause be had in Osage county, Okl., and, as grounds therefor, say:

"First. That section 40 of the Judicial Code provides that the trial of said cause shall be held in Osage county, Okl., the county where said offense is alleged to have been committed, where it could be done without great inconvenience; that not only would no inconvenience result from the trial of said cause in Osage county, but that a trial in Osage county will result in great convenience to all parties concerned in the prosecution and defense of said cause.

"Said defendants respectfully represent and show to the court that the city of Pawhuska, the county seat of Osage county, has been designated by the Congress of the United States as a place for holding United States court, in the Northern district of Oklahoma, and that pursuant thereto that one term of the United States court for the Northern district of Oklahoma has been held in the city of Pawhuska, and that such court terms will continue to be held in the city of Pawhuska, pursuant to said act of Congress; that Osage county has a large, convenient, and commodious county courthouse, and a large and commodious district courtroom therein, and that the same has been tendered to and used by the United States court for the Northern district of Oklahoma for the holding of court therein, and that the same is at all times available to the United States court for the holding of its sessions in the city of Pawhuska.

"These defendants further say that the city of Pawhuska is provided with ample hotel facilities and conveniences for the use of the court, attorneys, witnesses, and jurors in attendance at said court.

"Defendants further say that the alleged offense in this case was committed near the town of Fairfax, in Osage county, Okl., at a distance of approximately 30 miles from Pawhuska, the county seat, and that it is approximately 100 miles to the city of Guthrie, the nearest court town in the Western district of Oklahoma. That the principal witnesses, both for the United States and the defendants, live in and around the town of Fairfax, and great convenience would result to said witnesses, both for the government and for the defendants, if said cause was tried in Osage county, and that great inconvenience would result if said trial is held elsewhere in this district.

"The defendant John Ramsey alleges and says that he is a poor person, and that his

means are very limited, and that a trial of this case at Pawhuska will convenience him in the procurement of the attendance of witnesses to testify in his behalf, but that he is unable to pay the expenses of said witnesses to appear in his behalf at Guthrie or Enid or other court towns in the Western district of Oklahoma, or to pay the expenses of the marshal in subpœnaing said witnesses for said purpose.

"Defendants further respectfully show to the court that, under section 59 of the Judicial Code (28 USCA § 121), the court, upon application of the defendant, is authorized and empowered to transfer the trial of said cause to Osage county, notwithstanding the fact that the Northern district of Oklahoma has been created since the alleged commission of the offense of which the defendants stand charged.

"Wherefore defendants pray that the court make and enter its order transferring the trial of this cause to Osage county, Okl., as herein prayed."

Section 40 of the Judicial Code, upon which this motion is predicated, provides as follows:

"The trial of offenses punishable with death shall be had in the county where the offense was committed, where that can be done without great inconvenience."

The Act of Congress of February 16, 1925 (Comp. St. § 1088d), by which the redistricting was effected, contains the following provision respecting the jurisdiction and authority of the courts of the several districts as affecting the prosecution of crimes and offenses committed therein prior to the establishment of the Northern district:

"Jurisdiction and authority of the courts and officers of the Western district of Oklahoma, and of the courts and officers of the Eastern district of Oklahoma as heretofore divided between them by the order of the senior judge of the Circuit Court of Appeals for the Eighth Circuit of the United States over the territory embraced within said Northern district of Oklahoma shall continue as heretofore until the organization of the District Court of said Northern District, and thereupon shall cease and determine, save and except in so far as the authority of the junior judge of said Eastern district is continued in him as judge of said Northern district, and save and except as to the authority expressly conferred by law on said courts, judges or officers, or any of them, to commence and proceed with the prosecution of crimes and offenses committed therein prior to the establishment of the said Northern district, and save and except as to any other authority expressly reserved to them or any of them under any law applicable in the case of the creation or change of the divisions or districts of District Courts of the United States."

The authority expressly reserved "under any law applicable in the case of creation or change of the divisions or districts of District Courts of the United States" is conceded to be section 59 of the Judicial Code, which, in so far as applicable, provides as follows:

"Whenever any new district or division has been or shall be established, or any county or territory has been or shall be transferred from one district or division to another district or division, prosecutions for crimes and offenses committed within such district, division, county, or territory prior to such transfer, shall be commenced and proceeded with the same as if such new district or division had not been created, or such county or territory had not been transferred, unless the court, upon the application of the defendant, shall order the cause to be removed to the new district or division for trial."

By this provision the constitutional rights of defendants respecting venue are strictly preserved.

It will be observed that the motion of plaintiff in error for transfer was based upon section 40 of the Judicial Code, which provides that offenses of this nature shall be tried in the county where they are committed where that can be done without great inconvenience. The prayer was for a direct transfer to Osage county. Laying aside all question of convenience or inconvenience, the District Court for the Western District of Oklahoma was without power to transfer this case to a specific county of the Northern district. No application was made under section 59 for transfer to the Northern district. If such application had been made, it would have been the duty of the District Court for the Western District to transfer the case to the Northern district generally. It would then have been a matter for the court of the latter district, upon due application made, to determine whether the degree of convenience prescribed would permit the trial to be held in Osage county. That obvious procedure was not invoked by plaintiff in error and his codefendant. The trial court was clearly right in refusing to order a transfer beyond its power and authority to grant, and its jurisdiction to proceed with the trial in the district in which the crime was committed, the

same as if the new district had not been created, is plain. Caha v. United States, 152 U. S. 211, 213, 14 S. Ct. 513, 38 L. Ed. 415; Mattox v. United States, 156 U. S. 237, 239, 15 S. Ct. 337, 39 L. Ed. 409.

[2] The next point urged is that the indictment is insufficient to support a judgment of conviction in so far as this plaintiff in error is concerned. The grounds stated are that it does not set forth the offense with such clearness and certainty as to apprise the accused, as an abettor, of the crime with which he stands charged; that it does not furnish the accused with such a description as would enable him to make his defense and avail himself of his conviction or acquittal for protection against a further prosecution; that it does not inform the court of the facts alleged with sufficient definiteness and certainty to enable the court to decide whether or not those facts are sufficient in law to support a conviction—in other words, that it does not inform plaintiff in error "how or in what manner he aided Ramsey, nor how he abetted him, or counseled or commanded or procured him to do the deed in question." The indictment, after setting out with requisite particularity the acts of John Ramsey, who committed the murder, charges plaintiff in error in the following language:

"That William K. Hale, a white person, late of said district, then and there unlawfully, feloniously, willfully, deliberately, maliciously, and premeditatedly, and with malice aforethought on his part, did aid, abet, counsel, command, and procure the said John Ramsey in so doing and so to do."

This method of charging one who aids or abets in the commission of a crime has been authoritatively approved. In Coffin v. United States, 156 U. S. 432, 448, 15 S. Ct. 394, 400 (39 L. Ed. 481), the court said:

"Nor is the contention sound that the particular act by which the aiding and abetting was consummated must be specifically set out. The general rule upon this subject is stated in United States v. Simmons, 96 U. S. 360, 363 [24 L. Ed. 819], as follows: 'Nor was it necessary, as argued by counsel for the accused, to set forth the special means employed to effect the alleged unlawful procurement.'"

See, also, Daniels et al. v. United States (C. C. A. 9) 17 F.(2d) 339, 345. It is inconceivable that this defendant could be again prosecuted for a specific murder of which he had previously been acquitted. That he was not prejudiced in making his defense is made certain by the allegations contained in his motion for severance, filed before the trial took place, in which he says:

"The government will introduce evidence to the effect that the defendant John Ramsey has made certain statements to the officers of the United States and others, to the effect that he, the said Ramsey, did fire the shot which caused the death of the said Henry Roan, and that this defendant, William K. Hale, procured him so to do, paid him for so doing, and otherwise aided and abetted him in the commission of said offense."

[3] It will also be remembered that this case had been tried once before, in which all the facts tending to connect plaintiff in error with the murder had been developed. It may be added that plaintiff in error filed no demurrer upon this ground nor made application for a bill of particulars. At the outset of the prosecution, a demurrer was filed upon the single ground that the federal court was without jurisdiction, for the reason that the locus of the crime was not Indian country within the meaning of section 2145 of the Revised Statutes (25 USCA § 217). This demurrer was sustained by the District Court; that judgment was reversed by the Supreme Court. United States v. Ramsey et al., 271 U. S. 467, 46 S. Ct. 559, 70 L. Ed. 1039. No further attack upon the indictment was made. Furthermore, if demurrer or motion had been filed and overruled, "it would not avail the defendant, in error proceedings, unless it appeared that the substantial rights of the accused were prejudiced by the refusal to require a more specific statement of the particular mode in which the offense charged was committed." Armour Packing Co. v. United States, 209 U. S. 56, 84, 28 S. Ct. 428, 436 (52 L. Ed. 681); Ledbetter v. United States, 170 U. S. 606, 612, 18 S. Ct. 774, 42 L. Ed. 1162; Connors v. United States, 158 U. S. 408, 411, 15 S. Ct. 951, 39 L. Ed. 1033; Rev. Stat. U. S. § 1025 (18 USCA § 556).

[4] The next error assigned is the overruling of a motion to quash the indictment because of the presence of an alleged unauthorized person before the grand jury by which the indictment was returned. The person to whom reference is made is one Paul B. Bailey, who was present in the grand jury room when the testimony was presented to that body, and who took and transcribed the same. The government contends that the presence of Bailey is authorized under the Act of Congress of 1906, 34 Stat. 816 (5 USCA § 310), which provides:

"The Attorney General or any officer of the Department of Justice, or any attorney or counselor specially appointed by the Attorney General under any provision of law, may, when thereunto specifically directed by

the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which district attorneys now are or hereafter may be by law authorized to conduct, whether or not he or they be residents of the district in which such proceeding is brought."

The record shows that Bailey for five years had been a duly qualified and practicing attorney; that the Attorney General, by written order, had appointed him a special assistant to the Attorney General of the United States to assist in the trial of cases in which the government was interested and specifically "to conduct, in the Western district of Oklahoma, and in any other judicial district or districts where the jurisdiction thereof lies, any kind of legal proceedings, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which district attorneys are authorized by law to conduct." It further appears that Mr. Bailey took the required oath as such special assistant to the Attorney General. Counsel for plaintiff in error insist that the act of 1906 does not apply, because Bailey did not conduct proceedings before the grand jury, but merely took and transcribed the testimony. It is further urged that this practice operates to destroy the secrecy of proceedings before grand juries. It should be noted that the act of Congress applies to all who are authorized to conduct proceedings. A district attorney or an Assistant Attorney General may be present throughout an inquest without personal participation, but no one on that ground could challenge their right to be present, provided they did not participate in the deliberations of that body. We think also that the objection to taking down the testimony offered, the required secrecy being preserved in its proper intendment, is not well founded. We are aware that there is a conflict of decision upon this point, but we adhere to the rule announced in the following cases: Wilson v. United States (C. C. A. 2) 229 F. 344; Wilkes v. United States (C. C. A. 6) 291 F. 988, 992; May v. United States (C. C. A. 8) 236 F. 495. In Latham v. United States (C. C. A. 5) 226 F. 420, L. R. A. 1916D, 1118, which holds to the contrary, it will be observed that Lantz, who acted as stenographer, was a clerk in the office of the district attorney, was not a lawyer, had no authorization from the Attorney General, and merely had subscribed an oath to keep secret the proceedings of the grand jury. We do not think the rule announced in that case, upon the facts before that court, has application here in any event.

The eleventh assignment of error charges "that the court in the trial of said cause was prejudiced against the rights of this defendant, William K. Hale, and his codefendant, John Ramsey, and was biased in favor of the government of the United States throughout the trial of said cause, to the extent that he could not and did not give said defendants or either of them a fair and impartial trial." We have carefully examined the excerpts from the record, to which counsel has called our attention, and find in them no evidence of the bias and prejudice complained of. The record in this case contains approximately 800 pages and many days were consumed in the trial. The court had many difficult, questions presented and the case was tried with aggressiveness and zeal on the part of counsel. The court displayed great patience, and we find in his rulings no evidence of the attitude of which counsel complain.

[5, 6] An effort was made by the defense to show that a party other than Ramsey, to wit, one Roy Bunch, might have committed the crime. The court admitted the testimony of a number of witnesses to the effect that undue intimacy existed between Bunch and Roan's wife; that hostility existed between these men for this reason; that within 60 days after Roan's death Bunch and Roan's widow were married. In further support of this defense, one Sam W. Tulk, chief of police at Ponca City, Okl., was called as a witness to establish that one night, a short time before the death of Roan, a person thought to be Bunch was seen with a companion standing near a window of Roan's home. The witness was asked what these men did when they saw the officers and whether any shots were fired by either of the parties or the officers. This tendered testimony, upon objection, was excluded.

One Roy Cook was also offered as a witness, and testified that on one occasion, several months before Roan's death, he overheard a difficulty between Bunch and Roan in a pool hall; that both men were armed. The nature of the difficulty was not stated. The substance of this testimony was as follows:

"Q. Go ahead and tell what occurred. A. Along about noon Roy Bunch come in my pool hall and went on back and turned to the right; I have an offset in there of about 25 feet. In come Henry Roan about three minutes after that and went back there near to the offset and stopped and looked all around awhile and turned around and come

back up toward the counter and walked on out and went away.

"Q. Were both of these men armed on that occasion? A. Yes; I noticed a gun on both of them—just a bigness of a gun in here that looked to be in Henry Roan's pocket."

On motion, this testimony was stricken out as immaterial. Plaintiff in error excepted to the rulings upon the testimony of these two witnesses.

The rule applicable is well stated as follows:

"While evidence tending to show that another party might have committed the crime would be admissible, before such testimony can be received there must be such proof of connection with it, such a train of facts or circumstances as tend clearly to point out some one besides the prisoner as the guilty party. Remote acts, disconnected and outside of the crime itself, cannot be separately proved for such a purpose." Greenfield v. People, 85 N. Y. 76, 39 Am. Rep. 636.

"While it is competent for the defendant to show, by any legal evidence, that some other person committed the crime with which he is charged, and that he is innocent of any participation in it, such evidence must tend to connect such other person with the commission of the crime charged. An examination of the authorities will show that it is generally held that evidence which could have no further effect than to cast a bare suspicion upon another is incompetent and inadmissible." Irvin v. State, 11 Okl. Cr. 301, 146 P. 453.

The court evidently excluded the testimony under the rule thus stated, and we do not think its action, standing alone, would constitute reversible error. However, in view of the relationship shown and the evidence already before the court, we think the testimony of Tulk might well have been admitted, and, in general, in a capital case, opportunity should be afforded to present all competent evidence tending to show that a party other than the accused might have committed the crime under the rule above stated.

We come now to a consideration of what we regard as the more serious errors assigned. At the outset, plaintiff in error filed a motion for separate trial. In it he stated that at the former trial the government introduced an alleged confession of the codefendant, John Ramsey, in which confession Ramsey stated that plaintiff in error employed him to kill Henry Roan, agreeing therefor to give Ramsey a Ford car and to pay him the sum of $500; that the introduction of this alleged confession and other testimony of like nature;

while binding upon Ramsey, would be extremely prejudicial to plaintiff in error; that therefore plaintiff in error, in the interest of justice, was entitled to a separate trial. The court was apprised of the nature of this statement, that it had been introduced at the former trial, and that it again would be offered at the instant trial. The motion for severance was overruled, and an exception preserved. The statement of Ramsey, to which reference was made, is as follows:

"Statement made by John Ramsey to F. S. Smith and T. B. White.

"After being warned by Mr. Smith and White that I do not have to make a statement and that any statement I do make can and may be used against me in the trial of the case concerning which such statement is made and after being so warned and without fear of consequences I now make the following free and voluntary statement:

"Some time in the early part of 1923 the date I don't recall Bill Hale came to Henry Grammers ranch where I was working for Grammer selling whiskey. I was in the bunk house and Henry Grammer called me. I went out and saw him and Hale standing together. I walked over to them, and the 3 of us walked out several yards to a road and stopped. Henry Grammer turned to me and said that Hale had a little job he wanted done and asked me if I would do it. I said, 'It depends on what the job was.' Grammer said he wanted an Indian bumped off. I said, 'That's different.' Hale, Grammer and I then talked the matter over for a few minutes I don't recall just what was said but I remarked that I would look it over, and I went back to the bunk house. In a few days Grammer told me that Hale was getting anxious to have that job done. As I remember the next time I saw Hale was in Fairfax and we had another talk about the Indian he wanted killed, and I told him (end of the first page of confession) (second page) I would do the job, but that I did not have any way to get around. Hale said he would see me in a day or two or in a few days. In a few days I again met Hale at Grammers ranch and Hale told me he was going to buy me a car, and gave me Five Hundred Dollars. Something was said about where I would buy the car and I said I would buy it at Ponca City, and something was said about my getting over there and Hale said he would drive me over to Pawnee which he did, and I caught the train there and went to Ponca City, where I bought a new Ford roadster from the Ford Garage. Before I received the car I made application and the Ford people secured a license. I drove back

to Grammers ranch. At some stage of the game Hale pointed out to me the Indian that he wanted killed on the streets of Fairfax. I don't remember Hale ever telling me the Indian's name. Several days after Hale pointed this Indian out to me I met this Indian in a restaurant in Fairfax and he sat down beside me and I smelled whiskey on his breath and we got into conversation about whiskey and I told him I could sell him some. He said he wanted some and I told him to meet me out on the road running thru Sol Smiths pasture about 10 o'clock and I would meet him and have the whiskey for him. I left him and went to Grammers and got some whiskey and drove (end of second page) (third page) back on the road leading thru Sol Smiths pasture and found this Indian sitting in his car waiting at a point near Salt Creek. I drove up and got out of my car and we took several drinks from a bottle I had. I then got in my car and went to Fairfax. Several times after that I met this Indian and gave him drinks, this went on for several days and I was trying to rib up a little more courage, finally one day. I decided to pull the job, everything being favorable, so I told this Indian to meet me out on the road running thru Smiths pasture that I would have some whiskey for him. I told him about what point on the road I would meet him, so he went out on the road and I on another. We met about the foot of the big hill near Salt Creek. I motioned to him to go up on top of the hill which he did and stopped I drove up & I saw a car coming and I told him to drive off under the hill which he did. I got out of my car and when the car I had seen passed I then walked down under the hill where I found him waiting for me. He got out of the car and we sat on the running board of his car and drank what whiskey I had. The Indian then got in his car to leave and I then shot him in the back of the head. I suppose I was within a foot or two of him when I shot him. I then went back to my car and drove to Fairfax. In a few days I saw Hale and told him enough for him to understand that I had killed (end of third page) (fourth page) the Indian. There was very little said at this time. Some little time later I again met Hale and there was something said about paying me the balance of five hundred dollars, Hale saying he would pay it a little later as he would have more money then and I told him that was all right that I didn't need it then. Sometime within a month or 2 Hale paid me the balance due me of Five Hundred Dollars. Some several days, I don't remember just how long, but something like

ten days this Indians body that I killed was found and as I remember that was the first time I found that his name was Henry Roan."

When the statement was offered, objection was made that the statement was not voluntary, and was made, if at all, under promise of benefit and under coercion. Counsel requested the court to hear the testimony on this point in the absence of the jury. The court ruled as follows:

"We will hear this evidence. It will all go in as part of the case. If you have any evidence it is involuntary, we will hear you. Proceed. Motion overruled."

Witness T. B. White, one of the government officers to whom the confession is alleged to have been made, was on the stand at the time, and was permitted to testify to the substance of the contents of that confession before it was formally offered. Thereafter the following occurred:

"Mr. Leahy (for the Government): I will ask permission to read the statement to the jury.

"The Court: Very well.

"Mr. Springer: The defendant here requests the court to exclude the jury to hear testimony relative to whether this statement that is now attempted to be introduced in evidence was voluntarily made, or whether it was made without the promise of benefit or hope of reward, or whether it was signed under coercion and threats.

"The Court: That is a question of fact for the jury, and these facts will all be submitted to the jury. Proceed.

"Mr. Springer: To which we except."

Thereupon, the statement was read to the jury. Exception is preserved to the refusal of the court to determine the admissibility of the confession before its submission to the jury and to the prejudicial effect of that part of the confession which connected plaintiff in error with the murder.

[7] This court has held that it is the duty of the court to determine whether or not an alleged confession by an accused person was voluntary or involuntary, and that it is error to permit the introduction of the evidence upon that question before the jury. The admissibility of such a statement is not primarily a question of fact for the jury, but it is the duty of the court alone to hear and decide it. Harrold v. Territory of Oklahoma (C. C. A. 8) 169 F. 47, 17 Ann. Cas. 868. To the same effect, Bram v. United States, 168 U. S. 532, 555, 18 S. Ct. 183, 42 L. Ed. 568; Rossi v. United States (C. C. A. 9) 278 F. 349, 353, 354; Perrygo v. United States, 55 App. D. C. 80, 2 F.(2d) 181; Mangum v. United

States (C. C. A. 9) 289 F. 213, 215. Of course, as stated in the latter case, the court is necessarily vested with a very large discretion, which will not be disturbed on appeal, unless a clear abuse thereof is shown.

[8] It is true that the granting of a separate trial rests in the sound discretion of the court. Lennon v. United States (C. C. A. 8) 20 F. (2d) 490; Buchanan v. United States (C. C. A. 8) 15 F.(2d) 496; Krause et al. v. United States (C. C. A. 8) 147 F. 442. In the latter case, Judge John F. Philips, speaking for this court, said:

"At the time such preliminary question arises, the judge, not being in possession of other facts than those disclosed on the face of the indictment, must act thereon until a clear showing made on the part of the objecting defendant that his interests will be seriously prejudiced by a joint trial. And where it becomes apparent to the presiding judge in the progress of the trial that injustice may be done to any defendant by such joint trial, it is to be presumed that he will afford relief by awarding a new trial."

[9] It is equally to be presumed that, if it appears that the interests of a defendant have been seriously prejudiced and that injustice may have been done, this court as well should afford relief. It is true, of course, that, where the admissibility of the statement has been ruled, and the evidence, is conflicting, the determination of whether the statement was voluntarily or involuntarily made may be submitted to the jury under proper instructions. The rule is thus stated in Wilson v. United States, 162 U. S. 613, 16 S. Ct. 895, 40 L. Ed. 1090:

"When there is a conflict of evidence as to whether a confession is or is not voluntary, if the court decides that it is admissible, the question may be left to the jury with the direction that they should reject the confession if upon the whole evidence they are satisfied it was not the voluntary act of the defendant."

See, also, Sparf v. United States, 156 U. S. 51, 54, 15 S. Ct. 273, 39 L. Ed. 343; Hopt v. People of the Territory of Utah, 110 U. S. 574, 583, 4 S. Ct. 202, 28 L. Ed. 268; Perrygo v. United States, 55 App. D. C. 80, 2 F.(2d) 181, 184; and numerous cases in notes in 56 L. R. A. 434, and 16 L. R. A. (N. S.) 660.

[10] Here the court was apprised in advance of the nature of the statement and its necessarily damaging effect upon plaintiff in error. It is fundamental that no man can confess for any one but himself. People v. Anderson, 239 Ill. 168, 180, 87 N. E. 917. Confessions of this sort, if admitted, should be limited in their submission to the jury to those parts which tend to incriminate the party by whom the confession is made. McCann v. People, 226 Ill. 562, 569, 80 N. E. 1061.

[11-13] It is necessary, therefore, to determine whether the confession of Ramsey as introduced was necessarily prejudicial to plaintiff in error, and whether, in view of the fact that its introduction was anticipated, the motion for severance should have been granted. The connection of Hale with the crime rested almost entirely upon the testimony of Burkhart, himself a confessed criminal, and a man of bad general character. It is debatable whether the conviction of Hale would have resulted from his testimony in the absence of the strong corroboration contained in the Ramsey confession, but concededly the confession of Ramsey was incompetent to bind Hale. The court so stated when it was admitted, and again in its charge; but it is inconceivable that the impression made upon the minds of the jurors could have been removed by these formal remarks of the court. Plaintiff in error is indicted as an abettor of Ramsey. Under ordinary circumstances, a joint trial would be proper procedure. In any case, as to Hale, it would be necessary to make proof that Ramsey committed the murder. United States v. Mills, 7 Pet. 138, 141, 8 L. Ed. 636; United States v. Simmons, 96 U. S. 360, 362, 24 L. Ed. 819. For that purpose the following part of the Ramsey statement, if adjudged to be voluntary and admissible, would be competent:

"I met this Indian in a restaurant in Fairfax and he sat down beside me and I smelled whiskey on his breath and we got into conversation about whiskey and I told him I could sell him some. He said he wanted some and I told him to meet me out on the road running thru Sol Smiths pasture about 10 o'clock and I would meet him and have the whiskey for him. I left him and went to Grammers and got some whiskey and drove (end of second page) (third page) back on the road leading thru Sol Smiths pasture and found this Indian sitting in his car waiting at a point near Salt Creek. I drove up and got out of my car and we took several drinks from a bottle I had. I then got in my car and went to Fairfax. Several times after that I met this Indian and gave him drinks, this went on for several days and I was trying to rib up a little more courage, finally one day. I decided to pull the job, everything being favorable, so I told this Indian to meet me out on the road running thru Smiths pasture that I would have some whiskey for him.

I told him about what point on the road I would meet him, so he went out on the road and I on another. We met about the foot of the big hill near Salt Creek. I motioned to him to go up on top of the hill, which he did, and stopped. I drove up & I saw a car coming and I told him to drive off under the hill which he did. I got out of my car and when the car I had seen passed I then walked down under the hill where I found him waiting for me. He got out of the car and we sat on the running board of his car and drank what whiskey I had. The Indian then got in his car to leave and I then shot him in the back of the head. I suppose I was within a foot or two of him when I shot him. I then went back to my car and drove to Fairfax. * * * Some several days, I don't remember just how long, but something like ten days this Indians body that I killed was found and as I remember that was the first time I found that his name was Henry Roan."

The balance of the statement or confession would not be binding upon Hale, and if admitted would leave upon the minds of the jurors a lasting impression to his prejudice. The unavoidable mischief of a joint trial is thus made clear. The entire confession, if admissible and voluntary, as has been stated, would be competent as to Ramsey. Its admission in its entirety would be necessarily prejudicial to Hale, as we have indicated; but, on the other hand, the exclusion of the part involving Hale would place the government at a serious disadvantage in its prosecution of Ramsey, because, among other things, the motive for the crime would be absent from the confession. It seems to us that these considerations are decisive against a joint trial.

[14, 15] Furthermore, the question of whether that confession was voluntary, or whether made with the promise of benefit or hope of reward or signed under coercion and threats, was a crucial one. Ramsey's testimony that the confession was extorted, not only by promises, but by threats and fear, was contradicted by the government officers before whom the statement was taken. Mr. White, one of these officers, was permitted to testify that the rules and regulations of the department forbid the use or employment of any of the means or agencies suggested in the treatment of prisoners. Again, in his argument to the jury, government counsel made this statement, in commenting upon the testimony of the government officers charged by Ramsey with having procured his confession by promises, threats, and coercion:

"Now, on the other hand, you have Mr. White and Mr. Smith, two men who represent the Department of Justice as I represent my government. These men appeared here on the witness stand. You looked in their faces. You observed their manner, and it is for you to determine whether you shall accept their sworn testimony or not. Their interest is not the same interest as that of Mr. Hale or Mr. Ramsey. I never knew in all my experience as a government officer a man who bears the commission of his own government to take the witness stand and deliberately lie to hang a human being. That is not being done, and it has never been done—

"Mr. Howard: The defendants object to that as not a proper statement and as not borne out by the evidence. There is no evidence of that kind before this jury.

"The Court: There is no evidence, but it is probably within common knowledge. I don't know. Proceed."

This was a matter entirely outside of the record, and certainly cannot be said to be a matter of common knowledge. This statement of counsel, taken in connection with the remark of the court, was calculated unduly to emphasize and support the testimony of the government upon this critical phase of the controversy.

Upon the entire record we feel that the application for severance should have been granted, that in any event, the admission of the statement of Ramsey, with its attending circumstances, may have operated to the prejudice of the defendant Hale, and that in the interest of justice a new trial should be granted.

[16] In view of this conclusion, a remaining assignment should receive consideration. On cross-examination it was shown, by way of impeachment, that Burkhart was an inmate of the penitentiary upon conviction for the murder of W. E. Smith and his family. The cross-examination in question, upon which reliance is placed, is the following:

"Q. You say you are now confined in the state penitentiary? A. I am.

"Q. On what charge? A. Murder.

"Q. Of whom? A. W. E. Smith.

"Q. That was the blowing up of the Smith home in Fairfax on March 10, 1923? A. That is right.

"Q. How long have you been in the penitentiary? A. Since the 4th day of October of this year."

On redirect examination, the following took place:

"Q. Now you were asked by Mr. Howard if he didn't ask you before you entered your plea of guilty if you were not guilty of the killing of W. E. Smith? A. He did.

"Q. I believe you answered him that you were guilty of carrying a message from Hale to Ramsey? A. That is right.

"Q. As to what was to be done? A. That is right.

"Q. And was that the extent of your participation in the blowing up of the Smith home, the carrying of that message? A. That is right.

"Q. When was it you carried that? A. On the 8th day of March, 1923.

"Q. Where to? A. To Ripley, Okl.

"Q. What was the message?"

To this question an objection was made on the ground that it was not proper redirect examination, and that the answer would involve a question of the guilt or innocence of Hale and Ramsey of the Smith murder, an entirely disconnected crime.

"The Court: He states that was his only connection with that affair, was this message. He now asks what that was. I think he may state. A. Hale came by my place on the afternoon of the 7th, and told me to go to Ripley the next morning, and for John Ramsey to go see Ace Kirby and have him to pull this job while he and Henry Grammer, Hale, were in Fort Worth; they were going to Fort Worth to the fat stock show.

"Q. What job? A. The Bill Smith blow-up.

"Q. You say you did go down to Ripley? A. I did. I went to Ripley the next morning, real early, in Hale's red Buick roadster.

"Q. You delivered that message to Ramsey? A. I did.

"Q. That, as you were advised by your attorney, made you a party to the crime? A. That is right.

"Q. And for that reason you plead guilty? A. I told him I was guilty of doing that, but as far as murder I was not guilty."

This testimony was evidently offered for the purpose of minimizing the impeachment of Burkhart by showing that his connection with the murder of Smith was of a less culpable nature, in that he did not himself participate in the actual killing. Whatever may be the merit of this purpose, it can scarcely be held to justify the unnecessary introduction of testimony tending to charge plaintiff in error with the commission of a crime entirely independent of that upon which he was being tried. We think the objection to the question, "What was the message?" should have been sustained, and that the admission of the succeeding questions and answers constituted reversible error. The prejudice re-

sulting was emphasized by the argument of the district attorney, in the course of which he said:

"The testimony discloses that later on in the night, after the telling of the Henry Roan killing, another statement was made as testified to by Mr. Burkhart. That statement was made in connection with the trip that Ernest Burkhart, made on March the 8th of that year—that trip that he took to Ripley, Okl., to deliver a message to these men, that William King Hale was going to a fat stock show in Fort Worth and when he was away 'do your duty,' and two days later W. E. Smith, his Indian wife, and innocent servant girl were blown to pieces. That was the conversation later that night. That was the message that Ernest Burkhart delivered on March the 8th to this man sitting right here. And you remember the testimony further in the register as to the day of March, the 10th, this man being in Fairfax that day also, that was the message that caused Ernest Burkhart to be where he is to-day, in the state penitentiary for the rest of his natural life. That is where Ernest Burkhart is, and that is the only part that he played in that murder. He is not involved in this Henry Roan killing. He had nothing to do with Henry Roan's death, but he knew about it; his own uncle was consulting and talking with him all along. Are you going to turn Bill Hale loose, are you going to turn John Ramsey loose, and let that man, Ernest Burkhart, spend the rest of his natural life in the penitentiary—"

And again, in the closing argument of counsel for the government, this was said:

"You should say by your verdict as courageous men, decent men, that they shall hang by the neck until they are dead, and you will then meet the plaudits of the people of this great state—"

[17] To these remarks objection was made, but an exception was not preserved. However, we deem it necessary to restate the well-known rule that cases should be tried upon the evidence presented, and jurors should not be diverted from the exercise of a dispassionate judgment upon the merits through fear of popular denunciation or hope of popular approval. Appeals of prosecuting officers of this nature have met with frequent and consistent disapproval.

Our conclusion is that the judgment below must be reversed, and the case remanded for a new trial in accordance with the views expressed in this opinion. It is so ordered.