## UNITED STATES ex rel. VALOTTA v. ASHE, Warden of State Penitentiary.

(District Court, W. D. Pennsylvania. November 17, 1924.)

No. 6.

1. Criminal law ⬅620(1)—Trial for two distinct felonies cannot be had before same jury at same time.

Under the laws of Pennsylvania, a prisoner cannot be tried for two distinct felonies before the same jury at the same time, since the joinder of distinct charges tends to confound the prisoner in his defense, prejudice him as to his challenges, hold him out as a habitual criminal, and distract the minds of the jurors.

2. Criminal law ⬅620(1)—Evidence of isolated double trials in felony cases not evidence of law.

Evidence that single trial of accused on more than one felony charge is unheard of throughout the state, except in isolated cases in one county, held insufficient to establish such

a long-continued and uniform practice as to justify trial for two felonies; such an invasion of rule being neither law nor evidence of what the law is.

**3. Criminal law ⊜⇒620(1)—Failure of accused to object to trial for two felonies at same time not waiver of right to separate trials.**

One charged with felony by standing mute waives no rights, and, in a prosecution for separate homicides, failure of accused to object to being tried for both offenses at one time is no waiver of his fundamental right to be tried for but one offense at one time.

**4. Constitutional law ⊜⇒251—"Due process" defined.**

"Due process" of law is process due according to the law of the land, and in the states is regulated by state law.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Due Process of Law.]

**5. Constitutional law ⊜⇒268—Double trial for distinct felonies violation of due process of law, and conviction void.**

The trial of one for two felonies at the same time and before the same jury was a denial of due process of law, notwithstanding accused made no objection, and judgments of conviction were null and void.

Habeas corpus by the United States, on the relation of Joseph Valotta, against Stanley P. Ashe, Warden of the State Penitentiary for the Western District of Pennsylvania. Relator discharged.

George R. Wallace, Franklin A. Ammon, and Thos. D. Chantler, all of Pittsburgh, Pa., for relator.

Samuel H. Gardner, Dist. Atty., and Harry A. Estep, Asst. Dist. Atty., both of Pittsburgh, Pa., for the Commonwealth of Pennsylvania.

THOMSON, District Judge. I approach the decision of this case with a full appreciation of the importance of the issue involved—the right of the state, on the one hand, to insist that the prosecution and punishment of offenders against her laws be in no manner impeded or denied, and the right of the citizen, on the other, to insist that his life be not taken away, except by due process of law. From the final judgment of a sovereign state, condemning him to death, a citizen of the United States, humble in birth and station, through the ancient writ of habeas corpus, appeals to the supreme law of the land. Such an issue, not infrequent, in the administration of the law, challenges at once our most careful, conscientious, and fearless consideration.

The real issue involved will appear by a brief statement of the facts as disclosed by the record of the trial. Joseph Valotta, the relator, a naturalized citizen of Italian birth, had been working steadily at the machine

shops of the Pennsylvania Railroad in Pittsburgh for about seven years. He was a man of good reputation for peace and good order. On July 1, 1922, a strike occurred at the railroad shops, which continued for several months. Valotta remained at work. By October 1st its activities had largely subsided, but the strike was not fully ended for a considerable period thereafter. During July and August, at least, the shops were picketed at intervals by the strikers, and the shops and workmen were guarded by mounted police. For some time officers escorted the workmen to and from their homes. At least on one occasion some demonstration of violence occurred at the works, at which Valotta was present, and to whom it appears to have been at least partially directed. Shortly afterwards he purchased a revolver from an officer inside the plant. Assaults on workmen at different times occurred, and the situation appears to have alarmed Valotta to such an extent that he ran from the shops to his house near by, on leaving work, and had not gone out of his home at night for about four months prior to the night of the shooting.

On the night of October 30th he went across the street to a party at his godmother's, where some friends, musicians, were playing. As he was about to leave, near 11 o'clock, at the request of a friend, Palermo, Valotta took the musicians over to another house, where there was a christening. Near 1 o'clock Valotta and Palermo, with others, left the house; Valotta and Palermo starting down Irwin avenue, a leading thoroughfare, on their way home. Freedmore street, which is one block in length, extends from Irwin avenue to Brighton road, and is intersected in the middle of the block by McCullough alley. On the corner of Irwin and Freedmore, three men were standing, Thomas Hopkins, Brady, and Rodgers. Brady was one of the strikers, or at least had left work on account of conditions, shortly after the strike was called. These three men had been together from 10:30 o'clock in the morning, and had been drinking heavily through the day and night. When they stopped at Irwin and Freedmore streets, they were intoxicated and disorderly, as was evidenced by loud talking, singing, and wrestling on the sidewalk. Officer Couch notified Hopkins to go home, which he failed to do. Another man, Conoran, joined the other three on the corner near 1 o'clock. The night was dark and foggy, and there was no light where the men were standing. As Valotta and Palermo approached Freed-

more street, they crossed Irwin for the purpose of going down Freedmore, and in doing so walked out in the street past the point where the men were standing, and reached the sidewalk on Freedmore street **a** short distance beyond the corner.

As to precisely what occurred there is some conflict, the defendant claiming that Hopkins called them scabs, and threatened to kill Valotta, as he advanced toward him. But it is clear that after the men had passed the corner, proceeding on their way, Hopkins called to the men, going out into the street, and approached them, using his hands in a threatening manner. When a few feet away, it is testified that Valotta said, "What are you looking for—trouble?" and, pulling out his revolver, fired. Hopkins fell, mortally wounded. Valotta and Palermo started running down Freedmore. Policeman Couch, who was near by patrolling his beat, hearing the shot, pursued the fleeing men; Brady and Rodgers joining in the chase, the officer being in the lead. The officer gained on Valotta, but did not call on him to stop, or announce that he was an officer. When within a short distance of the fleeing men, Valotta suddenly fired four shots in quick succession, all of which struck the policeman. He sank to his knees, but rose again, continuing for some distance, where he fell some 200 feet from Irwin avenue. There was a light at McCullough alley, near where the shooting occurred. Couch was removed to the hospital, where he died the following day.

After the shooting, Valotta and Palermo continued their flight; Rodgers and Brady failing to overtake them. Valotta went home, throwing away his revolver as he went, left his home between 9 and 10 o'clock, concealed himself in a brickyard not far away, stayed with different friends in Pittsburgh for several nights, and then went to Pitcairn, a nearby town, to the home of an acquaintance, where he was arrested a few days later. When arrested, he did not deny the shooting, told the policeman where he had thrown the revolver, and, when taken by the officers to the scene of the killing, pointed out the various spots connected with the homicide.

Two indictments charging murder were found against Valotta, the one for the killing of Couch and the other for the killing of Hopkins; the former being No. 17, and the latter No. 19, February sessions, 1923. Each indictment contained a count for murder and for voluntary manslaughter. The prisoner was arraigned on each indictment,

and to each he pleaded not guilty. Valotta being without money, the court appointed counsel to defend him. The cases were called for trial on March 12, 1923. An examination of the docket entries of the cases would lead to the conclusion that the cases were separately tried. The record at each number shows the convening of the court, the arraignment, the plea, the joinder of issue, the reading of the indictment, the instructions of the clerk to the jury, the list of jurors challenged, the jury made up and sworn, and list of witnesses for the commonwealth and for the defendant, and the verdict of the jury. As a matter of fact, the cases were called by the district attorney before the same jury at the same time, all the testimony of the commonwealth as to both homicides being offered, and, when completed, the commonwealth rested. A verdict of murder in the first degree was returned by the jury for the killing of Couch, and a verdict of murder in the second degree for the killing of Hopkins. The court charged the jury with relation to both indictments, submitting to them the possibility of eight several verdicts, namely, murder in the first degree, murder in the second degree, voluntary manslaughter, or not guilty, in each case; the jury being instructed to find a separate verdict in each.

The record does not disclose, nor does it appear, that there was any offer by the commonwealth, or any order of court, to consolidate the indictments, any consideration by the court as to the right or the propriety of trying the cases together, any exercise of discretion by the court in relation thereto, any putting of the commonwealth to an election as to which case it would try, any suggestion to the defendant as to his right to a separate trial, any consent on behalf of the defendant or his counsel to a joint trial on the two indictments, or any notice to the defendant of his right to 20 peremptory challenges under each indictment.

The legality of a single trial on the two indictments was raised by the defendant in his fourteenth reason for a new trial, as follows: "(14) If, in the mind of the prosecuting attorney, Joseph Valotta committed two distinct and separate homicides, and the double homicides of Couch and Hopkins were two distinct and separate acts of the defendant, then it was unlawful for the commonwealth to try Joseph Valotta on two distinct and separate indictments before the same jury." The court said: "This reason is without merit." The court then cites the

2 F.(2d)—47

case of Withers v. Commonwealth, 5 Serg. & R. (Pa.) 59, in support of his ruling.

The same question was again raised in the Supreme Court by an assignment of error (279 Pa. 84, 123 A. 681) in the same language as that above quoted. This was disposed of by the appellate court in the following words: "The fifth attack made on the integrity of the verdict is that it was improper to try the defendant upon the two indictments at the same time. The record shows that he made no objection to being thus tried. Assuming, but not deciding, that, notwithstanding his failure to object on trial, he can now be heard to raise the question, the simultaneous trial on two indictments charging murder is warranted, and the finding of guilty in the second degree on one indictment does not affect the first degree conviction on the other. Commonwealth v. Brown, 264 Pa. 85."

The judgment was affirmed, and a subsequent motion for reargument was overruled. The two cases referred to by the trial and appellate courts I will refer to later. It thus appears that, if the prisoner was denied a fundamental right in being called to answer to separate indictments before the same jury, involving his life, that denial was persisted in both in the trial court and in the appellate court. Some fundamental questions thus arise from this situation:

First. Could the prisoner be lawfully tried on two separate and distinct indictments, charging separate and distinct capital offenses, before the same jury, at the same time, according to the established law of Pennsylvania?

Second. If such trial was unlawful, has the prisoner waived his right by silence?

Third. If the trial was illegal, was the prisoner denied that due process of law guaranteed by the Fourteenth Amendment?

These questions are fundamental, and merit the most earnest consideration. We first inquire what is the law of Pennsylvania?

The legal history of Pennsylvania may be said to begin on March 4, 1682, with the charter granted to William Penn. That charter granted, inter alia, to him and his heirs, deputies, and lieutenants, for the government of the colony, the right to ordain and publish laws, raise money for the public use of the province, and to do all things necessary for the complete establishment of justice, the establishment of courts and tribunals, and forms of judicature, to delegate judges, award process, hold pleas, and determine in such courts and tribunals all

actions, suits and causes, criminal and civil, personal, real, and mixed. It was provided that the laws in question should not be repugnant to the laws of England, and that an appeal should lie to the king. Under this charter, a series of laws followed, propounded by Penn, and subsequently enacted from time to time by the colonial assembly. From the grant of the charter to the Declaration of Independence, there had grown up a body of Pennsylvania law.

While we have the statutes, we do not have in full the practice established by procedure; the first published reports beginning with 1 Dallas, in 1754. I am advised that a most careful examination of all Pennsylvania reports, from 1754 to 1791, shows that every indictment quoted in the reports was for a single criminal act. Justice Chase, in U. S. v. Worrall, 2 Dall. (Pa.) 384, Fed. Cas. No. 16,766, 1 L. Ed. 426, says: "Each colony judged for itself what parts of the common law were applicable to its new condition, and in various modes, by legislative acts, by judicial decisions, or by constant usage, adopted some parts, and rejected others."

To clear questions of usage, many of the early colonial acts were passed. In the case of Respublica v. Roberts, 2 Dall. (Pa.) 124, 1 L. Ed. 316 (1791), the court recognized the existence of a uniform practice in criminal procedure, when it said: "Under the act of assembly, and the uniform practice of 85 years (a practice, which, though it does not make the law, must be strong evidence of what the law is), the indictment could not be supported." We must therefore inquire, What was the common law of England as it existed in colonial times, and to what extent has it been modified by statute, by judicial decisions, or by uniform and established practice?

I think it may be definitely stated that, under the common law of England in the eighteenth century, the trial of two indictments for distinct offenses, before the same jury, was wholly unknown. It appears to have been permissible in misdemeanors to join in one indictment several counts, which might include different offenses, or different aspects of the same transaction, such as larceny and receiving stolen goods. In such case, however, the court at the trial exercised its right and duty either to quash the indictment or to put the crown upon its election which one it would try, in order that the prisoner might not be confounded in his defense and the jury distracted. In cases of felony, the rule was very strict. It

was permissible to charge in one indictment separate and distinct counts for felony, provided they were different legal phases of the same transaction. But, if it appeared that different counts charged separate and distinct felonies, it was the duty of the court to quash the indictment, or to require the crown to elect.

[1] The acts of assembly of Pennsylvania, and the early decisions of the courts, since 1754, established beyond controversy that a prisoner should not be tried for two distinct felonies before the same jury at the same time, and that the trials of separate and distinct misdemeanors rest on a very doubtful right, unless specially authorized by act of assembly. Whatever the right of trial by jury was, as secured and defined by the common law of England, and as developed in colonial practice, is the law of the land in Pennsylvania, and cannot be altered except by statute; this for the conclusive reason that the right is embodied in the Constitution of the state. Our first Constitution of 1776 (section 25) declared that "trials shall be by jury as heretofore." This right was redeclared in the Constitution of 1790 (article 9, § 6) and that of 1838 (article 9, § 6); in these the language being, "Trial by jury shall be as heretofore, and the right thereof remain inviolate."

In determining what was the common law on the question of the trial of two indictments charging separate offenses before the same jury, from an examination of the authorities, confusion will be avoided and the decisions harmonized by keeping in mind the distinction between misdemeanors and felonies, the distinction between different counts in the same indictment and separate indictments charging separate and distinct offenses, the distinction between several charges against one and a joint charge against more than one, and the distinction of trial before the same jury consecutively and that before the same jury simultaneously. The rule is well stated by Chief Justice Fuller in McElroy v. U. S., 164 U. S. 76, 17 S. Ct. 31, 41 L. Ed. 355: "In cases of felony, the multiplication of distinct charges has been considered so objectionable as tending to confound the accused in his defense, or to prejudice him as to his challenges, in the matter of being held out to be habitually criminal, in the distraction of the attention of the jury, or otherwise, that it is the settled rule in England and in many of our states, to confine the indictment to one distinct offense or restrict the evidence to one transaction."

In New Hampshire the rule is stated in State v. Nelson, 8 N. H. 163, as follows: "No court ever permits a prisoner to be tried for two distinct and separate crimes upon one indictment; because by such a course he might be confounded in his defense, and the minds of the jurors distracted. 3 D. & E. 98, Young v. The King."

The case of Young v. The King, above cited, elaborates the position. The same rule is sustained in Regina v. Giddins, Car. & Mar. p. 634. There the defendant was charged with assaulting and robbing two men, who were walking together at the time of the assault. The indictment contained one count. Motion was made to put the prosecution on election. Justice Tindle said: "I think the counsel for the prosecution is not to be put to election. It is all one act, and one entire transaction, the two prosecutors were assaulted and robbed at one and the same time, and there was no interval of time between the assaulting and robbing of the one, and the assaulting and robbing of the other. If there had been, the felonies would have been distinct; but that is not so in the present case."

The Earl of Hansbury's Laws of England, vol. 9, p. 342, state: "At common law, there was no legal objection to several different felonies being charged in different counts in one indictment, but it is a well-established rule of practice that if different felonies, not being different ways of describing the same act, are charged in separate counts of one indictment, the judge will put the prosecutor to his election to proceed and offer evidence on one charge only"—citing cases.

Wharton's Criminal Practice, § 34, says: "As to offenses of high grade in all states, and in some states as to all offenses, the court will not permit more than a single issue to go to the jury, and hence will require an election at the close of the prosecution's case, except in those cases in which offenses are so blended that it is eminently for the jury to determine which count it is that the evidence fits. The object of the rule, is, first, to enable the defendant to prepare properly for his defense; and, secondly, to protect him by an individualization of the issue, in case a second prosecution is brought against him."

Joyce on Indictments, § 493, lays down the rule that in distinct offenses it is the duty of the presiding judge, *without waiting for a motion to that end from the defendant,* to order the prosecuting officer to elect

on what charge he will continue the trial. See also, Rex v. Clendon, Strange, 870.

The well-established rule of the common law of Pennsylvania, forbidding the trial of distinct felonies before the same jury, has not been modified by statute. On the contrary, the rigor of the rule has been recognized in reference to the joinder of counts in one indictment. Recognizing that it required the sanction of legislation to permit even such joinder, certain statutes have been passed for that purpose. By the Criminal Act of 1860 (P. L. 427) the district attorney was empowered to charge willful and involuntary manslaughter in the same indictment. Another section makes it lawful to add in one indictment for feloniously stealing property a count for felonious receiving of the same; by another section, in the case of embezzlement by clerks and certain others in the employ of a master, to charge distinct acts of embezzlement, not exceeding three, committed against the same master within the period of six months. Section 25. of the act makes the arraignment of the prisoner, in all cases of felony, obligatory, and provides that "in all cases of felony the prisoner shall be arraigned, and where any person on being so arraigned shall plead not guilty, every such person shall be deemed and taken to put himself upon the inquest or country for trial, without any question being asked of him how he will be tried, and the inquest shall be charged only to inquire whether he be guilty or not guilty of the crime charged against him, *and no more."*

Section 40 of the act (Pa. St. 1920, § 8161) provides for persons jointly indicted for an offense, in which case "it shall be in the discretion of the court to try them jointly or severally, except that in cases of felonious homicide, the parties charged shall have the right to demand separate trials; and in all cases of joint trials, the accused shall have the right to the same number of peremptory challenges to which either would be entitled if separately tried, and no more." The law of 1860 in reference to arraignment was modified by the act of 1895 (Pa. St. 1920, § 8114), by which the arraignment of defendants in courts of oyer and terminer is abolished, except where the indictment charges murder.

It would thus appear plain beyond reasonable doubt that the procedure of arraignment, plea, issue, and trial on a single issue in homicide cases is expressly retained and preserved; and, if there be a single case, either in Pennsylvania or in England, where

a person has been tried upon two indictments for two separate and distinct murders, before the same jury at the same time, and the decision has been sustained on authority of the common law, the court has no knowledge of its existence. The reason for the rule is based on considerations of humanity and the tender solicitude for human life, the highest gift of God. From the same humane source have come all the safeguards which the law has thrown around the accused: The presumption of innocence, the requirement of proof of guilt beyond reasonable doubt, the provision in the Pennsylvania Constitution giving to the accused the right to be heard by himself and counsel, to demand the nature of the accusation against him, to meet the witnesses face to face, and to have compulsory process in his favor, to have a speedy public trial by an impartial jury, and that he be not compelled to give evidence against himself, nor be deprived of his life, liberty, or property, unless by judgment of his peers and the law of the land.

The all-sufficient reasons assigned by the authorities for the rule of law awarding separate trials for distinct felonies is that a joinder of distinct charges tends to confound the prisoner in his defense, prejudice him as to his challenges, hold him out as a habitual criminal, and distract the minds of the jurors. So plain a proposition needs no elaboration.

Is the trial of two indictments charging distinct felonies, and particularly capital offenses, before the same jury, warranted by the judicial decisions of Pennsylvania? Most certainly not. The case of Withers v. Commonwealth, 5 Serg. & R. (Pa.) 59, relied upon by the trial court to support the commonwealth's contention, involved the joinder of two indictments for misdemeanors. Judge Gibson stated that he had found no case exactly like it, but found a strong analogy between it and those cases in which distinct offenses were included in separate counts of the same indictment, as the latter would be necessarily tried together, and that in cases of misdemeanors it had never been held that separate offenses could not be joined. But he adds: "As to felonies, a different rule prevails, and the court goes so far as to quash where distinct offenses are charged, or, if no motion for that purpose be made in time, to compel the prosecutor to select a particular offense, to which alone the prisoner is held to answer." Perhaps the chief reason which reconciled the learned jurist to the unusual procedure in that case

was that the defendant was allowed his challenges on each indictment, and thus was not harmed. The futility of this citation to support the government's contention is at once apparent.

The case of Commonwealth v. Brown, 264 Pa. 85, 107 A. 676, was relied on alone by the Supreme Court to support its position that the simultaneous trial is warranted, and the finding of "guilty in the second degree on one indictment does not affect the, first degree conviction on the other." In that case Brown broke into a store at night. Being discovered, Elford and a policeman were attempting to force their way into the store, when two shots were fired, one of which killed Elford, and the other shot killed the policeman. Two indictments were found and tried together; a verdict of murder in the first degree being found in one, and second degree in the other.

It is sufficient to say that the question now before us was never raised at any point in the proceedings in that case. It was not discussed nor in any manner decided by the Supreme Court, and hence is not to be relied upon as an authority on the question. In that case, too, the killings might be regarded as simultaneous acts. In the case before us, the offenses, though closely connected in point of time and place, are wholly separate and distinct. This is conclusively shown by a consideration of the facts surrounding each homicide, by the verdict of the jury finding different degrees of guilt, and, finally, by the finding of the Supreme Court itself.

In answer to the defendant's claim of double jeopardy, the court said: "How it could be contended that there is double jeopardy to a defendant in trying him for the killing of two different individuals, it is a little difficult to comprehend. Twice in jeopardy is available to a defendant as a bar only where he has been twice put in jeopardy of life or limb for the same offense; * * * where two persons are killed—'by separate shots or strokes, although in the same riot or affray, an acquittal or a conviction of one * * * homicide is no bar to an indictment for the other, as they are distinct acts.'"

Aside from the Valotta Case, I think it may be safely said that no case in Pennsylvania can be produced, from the foundation of the state to the present time, in which the Supreme Court has considered and decided that two indictments, charging separate and distinct felonies of a high grade, and particularly capital felonies, may be tried together by the same jury at the same time.

[2] Sanctioned neither by common law, by the statute law, nor by judicial decision, the evidence taken on this hearing shows that the practice contended for finds no support in long-established practice. The evidence shows that such procedure is unheard of in Philadelphia and throughout the commonwealth, except in some isolated cases in Allegheny county. Hon. John C. Haymaker, a judge and criminal lawyer of large experience, being called by the respondent on this question, was asked:

"Q. Now, in connection with the trial of both indictments, or the several indictments, where no objection has been made and no request for severance made, what has been and what is the practice and procedure in so far as the number of challenges, peremptory challenges, allowed the defendant, is concerned? A. The same as if he was tried on one indictment."

This, of course, would deprive the prisoner of 20 peremptory challenges. The judge being then asked by the court whether, when the offenses charged in separate indictments were somewhat closely connected, was the claimed right of the state to try the indictments together based on a right which the state could insist upon, or based on the assumption that the defendant by his silence had waived it, the judge's answer was, "On the assumption that the defendant has waived it by keeping quiet, sitting still."

The testimony offered by the respondent thus comes very far short of establishing a long-continued and uniform practice, such as to justify the state's procedure. Such invasions in practice of the time-honored rule in the prisoner's favor neither make the law nor constitute evidence of what the law is.

Second. We now pass to the second question: Did the defendant waive his right to separate trials by his silence?

[3] In all criminal cases, and more particularly in felonies of high grade, the prisoner is not required to open his mouth at any stage of the proceedings. Even if he stand mute, a plea will be entered for him by the commonwealth, and the trial will proceed. He has the high prerogative of silence; a silence which the state dare not in any manner invade. In criminal proceedings, involving the life of the prisoner, every step of the state's procedure is adverse, resting not at all on the prisoner's consent, from the time of his arrest on warrant until he is led on the scaffold and the fatal trap is sprung.

In the remorseless movement of the state's criminal machinery, consent has no place at all. The result which follows, when adverse to the prisoner, is justified only when procured by established procedure in strict accord with the law of the land. What course of reasoning, when human life is at stake, can justify an invasion by the state of a right of the prisoner guaranteed him by the law, on the ground that the prisoner has not spoken and has therefore by his silence consented?

In Lewis v. United States, 146 U. S. 370, 13 S. Ct. 136, 36 L. Ed. 1011, were laid down some fundamental principles—among these, that a prisoner cannot waive the substantial rights incident to trial by jury; that the right of challenge is a substantial right; that it must appear affirmatively on the record that the prisoner enjoyed the rights guaranteed to him by the Constitution. The Supreme Court quotes with approval, on page 372 (13 S. Ct. 137), the case of Prine v. Commonwealth, 18 Pa. 103, holding: "We are of opinion that it was not within the power of the accused or his counsel to dispense with the statutory requirement as to his personal presence at the trial." The court again said: "The public has an interest in his·life and liberty. Neither can be lawfully taken, except in the mode prescribed by law. That which the law makes essential in proceedings involving the deprivation of life or liberty cannot be dispensed with or affected by the consent of the accused, much less by his mere failure, when on trial and in custody, to object to unauthorized methods." This position has been fully sustained in Prine v. Commonwealth, supra.

In Mills v. Commonwealth, 13 Pa. 627, the court said: "I need not repeat the authorities which establish that consent cannot give jurisdiction. In criminal proceedings especially, that axiom has grown with the growth and strengthened with the strength of the law. Trials by lynch law might otherwise be valid; but at times, I dare to say, a man might consent to their jurisdiction, in hope or in fear, or perhaps in ignorance. * * * Some affidavits and some certificates of such consent were produced at bar, but the counsel for the defendant positively deny it on their affidavit. But we can regard neither the one nor the other; they are no part of the record, nor can they be made such. But for myself I think it a matter of no account, and if the prisoner had appeared in court, and under his sign manual, on the record, agreed to be then tried, it would not have the slightest influence with me. I look to the law of the land."

We now come to the third inquiry upon which the question of jurisdiction rests. Did the state in violating the relator's right to a separate trial on the two indictments for murder, deny to him that due process of law guaranteed by the Fourteenth Amendment?

Various definitions have been given by the authorities to the words "due process of law." While certain governing principles have been distinctly announced, and certain boundary stakes driven, the Supreme Court has never undertaken to give a comprehensive definition of the term, nor undertaken to limit its meaning and scope by lines definitely drawn. The court has preferred to rest each decision on the facts of each case as it arose. But from these decisions we know that the prohibition is directed to the state itself, and if a violation be threatened by one agency of the state, but prevented by another agency of higher authority, there is no violation by the state. We know that the state can go very far in the exercise of its sovereign power, in the passage of laws regulating procedure, evidence, and methods of trial, not in conflict with the federal Constitution. It may make indictment by grand jury unnecessary in prosecutions for homicide; may make lawful the prosecution of felonies by information; may limit the number of challenges allowed the defendant, or regulate the number, in relation to the population of cities; may confer upon the accused the right to waive a trial by jury, and elect to be tried by the judge; may take away trial by jury altogether, both in criminal and civil cases; may abolish courts, and establish new ones, with new modes of procedure, leaving unchanged those substantial protections, with which the existing laws surround persons accused of crime.

[4, 5] These powers, and very many more, some of which are summarized by Justice Moody in the case of Twining v. New Jersey, 211 U. S. 78, 29 S. Ct. 14, 53 L. Ed. 97, the state in the exercise of its sovereignty may lawfully exert, and the laws and modes of procedure which the state establishes every citizen thereof is ·absolutely bound to obey. To him they become "the law of the land." As was said by Chief Justice Waite in Walker v. Sauvinet, 92 U. S. 90, 23 L. Ed. 678: "Due process of law is process due according to the law of the land. This process in the states is regulat-

ed by the law of the state." From the duty of the citizen to obey the laws of the state arises the corresponding right of the citizen to insist that the state comply with its own laws, and to demand, in the language of the Constitution of the state, that he be not deprived of his life, liberty, or his property, unless by the judgment of his peers or the law of the land.

Measured by this standard, what conclusion follows? Under the law of the land, to proceed against Valotta for two distinct homicides, two indictments were legally essential, found and returned by a duly constituted grand jury. In each indictment the charge must be distinctly set forth, in order that the accused may properly prepare his defense, and be so identified that he may plead, on a subsequent charge for the same offense, former conviction or former acquittal. On each indictment he must be arraigned, and out of the arraignment comes the plea, and the issue of guilt or innocence, between the commonwealth and the accused. All these solemn prerequisites are intended to safeguard the rights of the prisoner in the important issue to be determined by the trial. To secure a fair and impartial jury, 20 peremptory challenges are allowed him. He is entitled to be present at every stage of the proceeding, and to meet the witnesses face to face.

With all these evidences of the state's solicitude for the protection of the accused, can it be possible that in the trial itself, in which are the issues of life and death, the officers of the state can deprive the prisoner of the essential right to a separate trial on the issue solemnly raised on each indictment? Can they be permitted to mingle and confuse the cases, by making hotchpot of the indictments and issues before a single jury, and jeopardize the life of the prisoner by holding him out as a habitual criminal, denying him his full legal right of challenges, confound the prisoner in his defense, and distract the minds of the jury? Such an invasion of the established course of trial in high felonies rises far above mere irregularity of procedure. The time-honored right of a prisoner to a separate trial on each indictment involving his life, which has been recognized for centuries, upheld by the courts as a continuous expression of the consciousness of the people, unchanged in the progress and development of the law, is basic, fundamental, and absolute, and involved in the very conception of free government.

If we stop to inquire, Did harm result to the prisoner from such a procedure? the answer is to be found in the verdict. Our statute provides that "all murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, shall be deemed murder of the first degree, and all other kinds of murder [save those committed in the perpetration of certain designated felonies] shall be deemed murder of the second degree." Thus two of the most conspicuous examples were chosen by the lawmakers to illustrate their meaning of willful, deliberate, and premeditated murder. And yet the jury, from a set of circumstances which practically precluded the existence of a willful, deliberate, and premeditated intent to kill—flight in the darkness, pursuit by supposed enemies, and a condition of mental terror, with no time for premeditation or deliberation—out of these comes a verdict of murder of the first degree, followed by the sentence of death.

Jurisdiction of the subject-matter of the offense, the place where it was committed, and the person of the prisoner the trial court undoubtedly had. But this jurisdiction was lost by the denial of the prisoner's fundamental right to a separate trial before a separate jury on each indictment against him. Being thus denied that due process of law guaranteed to every citizen under the Constitution, it follows that the court's proceedings and judgment against him were null and void, and the relator is held in custody in violation of the Constitution of the United States.

I have given due consideration to the various decisions of the Supreme Court touching the power and duty of the court on writs of habeas corpus, from Ex parte Royall, 117 U. S. 241, 6 S. Ct. 734, 29 L. Ed. 868, to Frank v. Mangum, 237 U. S. 325, 35 S. Ct. 582, 59 L. Ed. 969, and the latest important deliverance of the court in Moore v. Dempsey, 261 U. S. 93, 43 S. Ct. 265, 67 L. Ed. 543, and whatever the guilt of the prisoner, which it is not my province to determine, I have endeavored to follow the course succinctly stated by the learned judge in Mills v. Commonwealth: "Heeding neither the impulses of passion, nor tolerating the intrusion of prejudice, but in calm severity of judgment, applying the rules of the criminal law."

The relator is therefore discharged.