**AUERBACH v. UNITED STATES.**
**JOHNSON v. SAME.**
Nos. 9330, 9331.

Circuit Court of Appeals, Sixth Circuit.
June 24, 1943.

W. M. Fuqua, of Nashville, Tenn. (Frank E. Ratner, of Nashville, Tenn., on the brief), for appellants.

Ward Hudgins, of Franklin, Tenn. (Horace Frierson, Jr., of Nashville, Tenn., on the brief), for appellee.

Before HICKS, HAMILTON, and MARTIN, Circuit Judges.

HICKS, Circuit Judge.

Appellants Auerbach and Johnson were jointly tried upon an indictment containing two counts. The first count charged them with conspiracy "to remove, deposit and conceal * * * certain * * * distilled spirits and wines" with respect to which a floor stock tax was levied by the Revenue Act of 1941 "with intent to defraud the United States of such tax." Overt acts charged were (1) that from August 1 to October 31, 1941, appellants owned and operated a retail liquor store at 213 Fourth Ave., Nashville, Tenn., known as Famous Brands Liquors; (2) that about August 30, 1941, appellants began to make unusually large purchases of liquor which increased during the latter part of September; (3) that on October 1, 1941, appellant Johnson presented an inventory purporting to contain all liquor owned or possessed by appellants as of that date on the premises or otherwise, and specifying the amount thereof to Inspector Gilpin; (4) that on or about October 1, 1941, appellants concealed in the basement 1203.57 proof gallons of distilled spirits and 367.35 wine gallons omitted from the inventory and intended for sale in evasion of the Revenue Act of 1941; (5) that appellants knew when they supplied the inventory purporting to cover all distilled spirits and wines possessed by them that it did not include the liquors in the basement nor all the liquor on the first floor of the premises; and (6) that on October 1, 1941, appellants possessed at their store 2461.93 more proof gallons of distilled spirits than were included in the inventory purporting to contain all the distilled spirits owned and possessed by them for sale on that date.

The second count was based on 26 U.S. C.A. Int.Rev.Code § 3321 and charged appellants with the substantive offense of depositing and concealing "in the basement under said liquor store * * * 1203.57 proof gallons of distilled spirits * * * and 367.35 wine gallons of wine on which the tax levied by said Sections of the Revenue Act of 1941 had not been paid, with intent to defraud the United States of such tax."

Motions by both parties to strike certain evidence and for directed verdicts were overruled and the jury found each appellant guilty on both counts. The appeals raise questions—(1) as to the sufficiency of the evidence to support the verdicts on both counts; (2) whether there was any substantial evidence establishing the corpus delicti; (3) whether it was error to charge that making a false inventory would support a finding of guilty on an indictment charging only a physical concealment; (4) whether certain testimony of one Hartman was admissible; and (5) whether it was error to overrule an objection of Johnson to the admission of certain statements of Auerbach.

Sections 533 and 534 of the Revenue Act of 1941, approved September 20, 1941, 26 U. S.C.A. Int.Rev.Acts, amended Sections 2800 and 3030(a) (1) (A), (2) of Internal Revenue Code, so as to levy an additional floor stock tax per proof gallon on all distilled spirits and brandies upon which the current tax had already been paid. The tax was payable on all spirits on hand October 1, 1941, and the return was to be filed and the tax paid on January 1, 1942. In aid of its collection, regulations were issued by the Commissioner of Internal Revenue requiring dealers to make an inventory of all liquors they had on hand on October 1, 1941. It was in connection with this inventory that the alleged concealments were made.

In 1939 Auerbach sought to enter the whiskey business in Nashville. He could not immediately qualify for a license and loaned Johnson $3,500 to take out a license in his own name and Johnson opened a store on July 8th of that year. For about two years he was the purported owner of the business but Auerbach operated the store as manager and each appellant acted as clerk during a part of each day and each drew small amounts weekly for living expenses.

In July 1941, the two became partners, Johnson retaining only a 10% interest. Auerbach obtained his interest by cancelling Johnson's indebtedness to him which

884

had been incurred in setting up and carrying on the business.

The store included the street level floor with a back room on the same level and a basement under a part of the main floor. The stairway was enclosed. It descended back of the left show window, as one entered, and under a front counter. The opening to the stairway was inconspicuously located under the end of the counter away from the door and was only 36 inches high and 18 inches wide. Haddix, an Investigator of the Alcohol Tax Unit said, "You step down one or two steps on to a landing and then from the landing you go under an extension of the show window." McCane, an Inspector, said that he had to go down these stairs backward and that the handling of a case of whiskey took two people, one to stand on the stairs and the other to receive it through the opening. A truck driver who had delivered whiskey into the basement testified that he had to bend "a way down carrying a case in front" of him to get through the opening.

Johnson testified that the entrance had not been changed, and that it was just like it was when they went there. However, the opening was in a corner of the building, was small and would not be readily discovered by one unaware of its existence and there was no evidence that Gilpin, who received the inventory from Johnson, knew of the stairway.

The sales force consisted of Johnson, one O'Brien and Auerbach. Auerbach's wife helped occasionally. Johnson usually opened the store and worked until 6:30 or 7 at night. O'Brien observed the same hours. Auerbach usually came on about 12:30 and worked until closing time at 11 P. M.

Several wholesale liquor dealers testified that because of the expected incidence of the new tax they anticipated a rise in prices and had advised the trade that whiskey was going up in price and urged them to lay in large stocks at current prices. Appellants did this. They made unusually large purchases in September 1941. Auerbach testified that he could save money thereby.

The inventory of October 1, 1941, was made by Johnson. Auerbach left the store on September 30th at 5 P. M. to go to church in celebration of a religious holiday and did not return until 6:30 the next evening. Johnson testified that he commenced the inventory on the morning of September 30th; that he worked through the day until late closing time and did not finish until the afternoon of October 1st. Gilpin, Acting Inspector of the Alcohol Tax Unit, made three trips to the store for the inventory. He testified that it purported to cover the whole stock on hand and that Johnson said "he had no liquor in transit * * * and none stored at any other place."

Gilpin testified that he made a spot check in the two street level rooms, that everything seemed in order, and that he verified and signed the inventory. He testified that the basement entrance was not called to his attention.

The next afternoon, October 2nd, Inspector McCane visited the store "to see if they had concealed any whiskey." He asked Johnson for a copy of the inventory and checked against it. The inventory reported 1058.63 proof gallons of whiskey and 639.76 gallons of wine. A complete bottle by bottle check revealed 2461 proof gallons of whiskey and 342 gallons of wine unreported, the tax upon which approximated $1200.00. 1203 gallons of whiskey and 367 gallons of wine were found in the basement. All the whiskey and wine in the basement was seized, although Johnson claimed that some of it appeared in the inventory.

McCane testified that after Johnson handed him the inventory on October 2nd, he glanced through the storage room at the rear and walked through the front room. He said, "I made some rapid mental calculations and I could tell that he had more whiskey on his first floor than was reported on his inventory, and I asked him if that was all the spirits he had on hand. He said yes, this is all that he had. 'This is all we have on the premises' and as I started to step down through this opening I had been told about close to this show window * * *, he says, 'Now we have a little whiskey downstairs.' I decided to crawl through the opening and I had to turn around and go down backwards as though I was going down a ladder * * * and when I got down there the basement was full and I found over 600 cases down there and when I came back I asked him for his work sheets. I was so surprised at the large discrepancy,— * * * 'where is your work sheets?' and he said he had destroyed them, thrown them away."

McCane further testified that while the check was being made Auerbach approached him several times and asked what

he thought the Bureau would do with him; that he said this was his first offense and he was hoping they would make it light on him. Haddix, who participated in the check, testified that when he arrived he asked how much whiskey or spirits was concealed in the basement in excess of the inventory, and that Auerbach said "about $2000.00 worth." Later, on October 4th, Haddix was talking to Auerbach relative to the visit of the District Supervisor, and testified that Auerbach said, "You have caught me," and then said, "Why did I do it, I wish to God I hadn't done it" and began to sob. O'Brien testified that he saw Auerbach crying.

Appellee introduced the testimony of one Hartman, a competitor of appellants' just across the street, and it is admitted that there was ill feeling between Hartman and Auerbach and that, under a Nashville ordinance, if appellants were convicted and their store closed, another liquor store could not be opened within 900 feet of Hartman's. Hartman testified that several days prior to October 1, 1941, while he was in a telephone booth in the lobby of the Noel Hotel he overheard a conversation between two men whom he did not see. He testified that he had known Auerbach since July 1939, and that he had been friendly with him until he opened his own store, and that to the best of his belief the voice of one of the men was Auerbach's, although it was possible that he could be mistaken. The statement which he attributed to Auerbach was that "the previous floor tax previous to the one that was coming on, was so easy to get by that he figured he could do the same thing on this occasion."

■ We think the evidence sufficiently supports the verdicts and that the court did not err in overruling appellants' motions for directed verdicts. There was no plausible explanation of the wide discrepancy between the figures of the purported inventory and the actual stock on hand. Johnson's explanation that trade had been so heavy that he had to work alone, was often interrupted and that he was hurried by Gilpin, does not carry conclusive weight. He had had long experience in making inventories and while it is conceivable that he might have made a few errors, it is inconceivable that he would inadvertently omit from the inventory nearly two-thirds of the entire stock.

■ Auerbach is not exculpated by his absence when the inventory was made, nor by his testimony that he told Johnson and O'Brien to "take and check this stock carefully because I have to go to church and won't be here to guide you." A conspiracy may be shown by inferences or by circumstances. Johnson v. United States, 6 Cir., 82 F.2d 500, 504.

■ ■ We think that Hartman's testimony was admissible against Auerbach, to whom it was limited. In Underhill's Criminal Evidence, 4th ed., Sec. 128, it is said: "Indeed, even if it be conceded that identity is a fact, the answer should hardly be rejected because the witness is not positive of the identity of the accused beyond all doubt or because through excessive caution he qualified his answers by such expressions as 'I think' or 'I believe.' "

See, also, Wigmore on Evidence, 3rd ed., Vol. 2, § 660. Moreover, as Wigmore points out in § 658: "The result of the witness' observation need not be positive or absolute certainty. * * * There is no legal objection whatever to receiving such impression as the witness gained from his observation."

Whether under all the circumstances the testimony of Hartman is to be believed was a question for the jury.

■ Auerbach contends that the statements attributed to him by Haddix and McCane were not admissible since no offense had been established by evidence aliunde. We need not say anything more touching this contention than, as we have indicated, that we think the offense had been sufficiently established and that the facts were corroborative of the statements ascribed to Auerbach.

■ Motion was made by Johnson to exclude the testimony of Haddix respecting his conversation with Auerbach in which Auerbach said "You have caught me," etc. We think that the effect of this testimony as it related to Johnson was sufficiently explained to the jury by the court at the time that it was excepted to, at least there was no further complaint made touching it.

■ Finally, it is urged that the court erred in charging that under the statute concealment did not necessarily have to be physical concealment. The answer is that there was no exception to the charge of the court upon the point.

We have examined the entire record and find no reversible error therein.

Affirmed.