UNITED STATES v. GOTTFRIED et al. (two cases).

Nos. 63, 64, Dockets 20732, 20733.

Circuit Court of Appeals, Second Circuit.

Jan. 2, 1948.

Writ of Certiorari Denied March 29, 1948.

See 68 S.Ct. 738.

John T. Cahill and Noonan, Kaufman & Eagan, both of New York City (Jerome Doyle, of New York City, of counsel), for appellant Gottfried.

Henry Epstein, of New York City (Walter Herzfeld, of New York City, of counsel), for appellant Forman.

Francis Martocci, of Kingston, N. Y., for appellant Stanton.

Charles J. Nager, of New York City, for appellant Pure Rock Mineral Springs Corporation.

Frederick H. Block ·and John F. X. McGohey, U. S. Atty.; both of New York City (Bruno Schachner and Keith Brown, Asst. U. S. Attys., both of New York City, of counsel), for appellee.

Before L. HAND, ·SWAN, and ·AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

These are appeals from convictions under two indictments: one, against Gottfried and his corporation, charging them with making a fraudulent statement in writing in a matter affecting the administration of the Office of Price Administration;[1] the other, for a conspiracy between Gottfried, Forman and Stanton to defraud the United States by depriving it of the services of Stanton, an investigator in the Office of Price Administration.[2] The indictments were consolidated for trial and tried together; and the appeals raise six questions: (1) Whether the indictments should have been consolidated and so tried. (2) Whether the method of drawing jurors in the Southern District of New York is lawful. (3) Whether the foreman of the jury, after he had been excused and an alternate substituted, entered the jury room with the jurors, or had at any time during the trial improperly influenced the jury. (4) Whether a written confession, made by Stanton, was illegally obtained, and whether it was in any event improper to use it upon a joint trial with Gottfried and Forman. (5) Whether Stanton should have been cross-examined as to why he had originally claimed his privilege when questioned regarding the crime. (6) Whether the statute of limitations barred the indictment for making the fraudulent written statement.

The following is a general narrative of the facts which the evidence would have warranted the jury in finding, and which presumably they did find. Gottfried's company made and sold Pepsi-Cola, Hire's rootbeer and other "soft drinks" at Ellenville, New York; and in order to do so it bought and used large quantities of sugar. Under the regulations existing at the time—1942—the amount allowed to the company in each year depended upon the amount which it had used in 1941, and which it was obliged to enter upon an official form provided for the purpose. Although Gottfried did not actually fill out the form in this instance, he signed it, and he was aware at the time that it exactly doubled the quantity of sugar which the company had used in 1941. The statement was filed on April 29, 1942, with the Office of Price Administration, which about a year later—in March, 1943—received an anonymous letter declaring that it was false. The Office thereupon detailed the defendant, Stanton, to check it by examining the company's records; Stanton went to its office on March 19th, and saw Long, its president, who told him to come back in a few days. Long thereupon called up Gottfried in New York, and later at an interview: Gottfried told him "that his

---

[1] § 80, Title 18 U.S.C.A.

[2] § 88, Title 18 U.S.C.A.

sugar base was inflated," and "that he was into it up to his neck." Gottfried thereupon by telephone set about "trying to find some one who could help him," and was finally recommended to the defendant, Forman, a lawyer, who lived in Kingston. Later, Gottfried told Long to visit Forman, and at their interview Forman said that the matter could be arranged, but that it would cost $1500. On Sunday, the 28th, the three met at the Hotel Pierre in New York in an interview at which it was finally agreed that Forman should have $1500, as he demanded; and the next day Gottfried gave Long the cheque of his wife for that sum, which Long cashed at Ellenville, and paid Forman $1450 out of the proceeds. (What happened to the other $50 is not altogether clear, but later Forman received a company cheque for that amount.) At some date which was in sharp dispute Stanton appeared at Ellenville, and with Long made a pretended examination of the records. He accepted figures read off to him by Long without personally examining the records, and put them down on an adding machine. They equalled the amount in the statement which, as we have already said, exactly doubled the amount bought in 1941. This came about because Long at Gottfried's direction procured duplicate invoices of all the sugar which the company had bought during that year, and read both the originals and the duplicates. Stanton reported to his superiors in the Office of Price Administration in Albany that the statement was correct, and for this Forman paid him $200.

■ The first question is whether it was proper to consolidate the two indictments and try them together. That the consolidation formally complied with the Rule[3] admits of no debate; the "offenses," if not "based on the same * * * transaction," were certainly based on "transactions connected together." We agree that literal compliance with the Rule is not necessarily final, in cases where there is danger of confusion or of unfair prejudice from the joinder; and we will assume for argument that all the evidence admissible in a separate trial of each must be admissible in a separate trial of the other; for certainly that is the severest test that can be applied. If Gottfried and the company had been separately tried, it would have been relevant to prove Gottfried's efforts to escape detection by paying Forman to seduce Stanton. That would have brought in all the evidence of the conspiracy, because the conspiracy had no other purpose than to suppress detection of the false statement; and it is the universal rule that attempts to suppress evidence of a crime are competent evidence of guilt.[4] The case is, if possible, even stronger as to the conspiracy indictment. The purpose of the conspiracy being, as we have just said, to suppress evidence of the false statement, pre-supposed that there was a false statement which the suppressed evidence might prove; and nothing can be more relevant in proving a crime than to show that the accused had a motive to commit it. That does not indeed dispose of the admission of Stanton's confession, the consideration of which we defer for the moment; but, that aside, there could not be a properer occasion for consolidation and joint trial.

■ Next are the challenges to the composition of both the grand and petit juries; which we shall assume, without deciding, were seasonably made. These rested upon the fact that all jurors in the Southern District of New York are drafted from the Counties of Westchester, Bronx and New York, which, the defendants argue, results in a discriminatory imbalance between "urban" and "rural" jurors, for the excluded territory is heavily "rural." The Southern District comprises the three counties we have mentioned and eight others to the north and west of these, and we take judicial notice that in 1940 its total population was about 4,400,000, of which somewhat less than 550,000 live in the excluded territory. It is difficult to know just what the line of demarcation between "urban" and "rural" dwellers the defendants assert to constitute two divergent groups which must be propor-

---

3 Federal Rules of Criminal Procedure, rule 8(a), 18 U.S.C.A. following section 687.

4 Hodgskin v. United States, 2 Cir., 279 F. 85, 93; Di Carlo v. United States, 2 Cir., 6 F.2d 364, 368; Silkworth v. United States, 2 Cir., 10 F.2d 711, 720; Seeman v. United States, 5 Cir., 96 F.2d 732, 733; Hilliard v. United States, 4 Cir., 121 F. 2d 992, 997.

tionately represented. As an illustration we will draw the line at 28,000—the population of Kingston where Forman lived. If so, the "rural" dwellers in the eight northern counties were about 445,000 and in Westchester, about 265,000. Thus, if the draft was from the whole district, the chance that any single juror would be "rural" would be about sixteen per cent; and, if the eight counties were excluded the chance would be about seven per cent. In other words if the northern counties were included, an accused would have about an even chance of getting two "rural" jurors on a panel of twelve; and, if they were excluded, he would have not quite an even chance of getting one. The interest at stake—assuming that we are dealing with any serious interest at all—can be no greater than this, unless the line should be drawn at villages of smaller population. Those interested in political speculation may of course pursue such studies at their pleasure; but it is obvious that under any definitive of "rural," some "rural" jurors would be called.

█ It has indeed been stated[5] that jurors must be drafted "without systematic and intentional exclusion" of any "geographical," as well as of any "social, religious, racial" or "political" group; and that may well forbid the officials who draw up the lists from excluding any part of the district at their own choice. We assume that they may not do so; but if they do not, "geographical" uniformity is satisfied, for the district and circuit courts have had power since the first Judiciary Act of 1789[6] to divide a district territorially in the interest of an impartial trial, of economy, and of lessening the burden of attendance. There cannot be the faintest question of the constitutionality of this statute; the courts have again and again recognized its validity.[7] Furthermore, it would be impossible

in practice to administer it, if it were a condition that the divisions made must be so homogeneous that they showed an equal percentage of all possible groups. There are probably no districts in the Union, which can be divided without disclosing in the sections different racial, religious, political, social or economic percentages. To demand that they shall not, would be a fantastic pedantry which would serve no purpose and would put an end to the statute.

The argument proceeds, however, that there was never any order entered in the district which authorized its division, and that in May v. United States,[8] the court, although it recognized the validity of the statute, declared that without such an order the presumption was that the court believed an array drafted from the whole district would be "most favorable to an impartial trial." That may well be true in cases where the court has never either by express order, or by long recognized practice, in effect divided the district; but in the Southern District of New York, although no express order has been found, it appeared from the testimony of the clerk and his deputy, that for at least ten years before the trial it has been the unbroken practice not to draft jurors from counties north of Westchester, although residents of those counties have in a few cases been accepted, when they volunteered. A practice of such long standing must have been known to the judges of the district and have been approved by them. It is true that Judge Hand and I, who served as district judges in that district, each for more than twelve years, cannot now be sure, after a lapse of over twenty years, that our memories are reliable; yet we believe that the practice existed also in our time which in my own case goes back to 1909. Be that as it may, in Lewis v. United States,[9] in a similar situ-

[5] Thiel v. Southern Pac. Co., 328 U.S. 217, 220, 66 S.Ct. 984, 90 L.Ed. 1181, 166 A.L.R. 1412; Ballard v. United States, 329 U.S. 187, 192, 67 S.Ct. 261.

[6] 1 Stat. 88.

[7] Agnew v. United States, 165 U.S. 36, 42, 17 S.Ct. 235, 41 L.Ed. 624; Ruthenberg v. United States, 245 U.S. 480, 482, 38 S.Ct. 168, 62 L.Ed. 414; Lewis v. United States, 279 U.S. 63, 72, 49 S.Ct. 257, 73 L.Ed. 615; Spencer v. United States, 8 Cir., 169 F. 562, 565; Jarl v.

United States, 8 Cir., 19 F.2d 891, 894; Frantz v. United States, 6 Cir., 62 F. 2d 737, 738; Marvel v. Zerbst, 10 Cir., 83 F.2d 974, 977; Walker v. United States, 8 Cir., 93 F.2d 383, 392; United States v. Chaires, C.C.N.D.Fla., 40 F. 820, 821; United States v. Ayres, D.C.S. D., 46 F. 651.

[8] 8 Cir., 199 F. 53, 59.

[9] 279 U.S. 63, 72, 73, 49 S.Ct. 257, 73 L.Ed. 615.

ation, the Supreme Court assumed that such a division had been ordered because the jury had been so drawn in the case before it; and such has been the ruling in other instances,[10] in accord with the usual doctrine that, in the absence of evidence to the contrary, official conduct will be presumed to have the support of any conditions imposed upon its exercise. It is irrelevant that there may be places in the northern counties more easily accessible to the court house in Manhattan than some places in Westchester. No doubt that it true; but that would be an egregious, probably an impossible, boundary which eliminated every spot in the included area that was less accessible than any spot in the excluded area. The statute confers a power which, like any other power, the court need, and indeed can, use only with approximate exactness; it is engaged, not in a scholastic exercise, but in the practical administration of justice.

 The objection arising from the conduct of the foreman of the jury is based upon the following facts. Upon voir dire the judge asked all the jurors whether they had ever sat before in a criminal case; and told them, if so, to raise their hands. The juror who later became the foreman had in fact served upon at least seven criminal juries before; but did not raise his hand, although it did not appear that he intended to conceal the fact, and the judge later assumed the contrary. After the trial had gone along for six weeks the defence learned of the foreman's earlier service, and asked the judge to excuse him and substitute one of the two alternates, but he refused. Three days later the defence renewed its request, which it then coupled with a statement that the foreman had said in the presence of some of the other jurors that the judge had been unfair to the prosecutor. A witness was produced who swore that the foreman had so expressed himself in an elevator where there were other jurors; but the judge again refused to excuse the foreman. However, after he had delivered his charge, he did excuse him and substituted one of the alternates; and at no time, then or earlier, did any of the defendants ask more than that the foreman should be excused, or suggest, after he had been excused, that the jury was unsatisfactory. When the verdict came in, Mr. Noonan, Gottfried's attorney, did, however, move for a new trial on the ground that the foreman, "in an obviously angry mood did go down inside of this court room, and did enter the jury room, and it was not for at least five or ten minutes that the clerk * * * was able to get him out. * * * A period of five or ten minutes expired between the time he went in the room and the time he left to go in and talk to your Honor." Further: "* * * he had expressed an opinion during the luncheon recess, and said in effect he didn't care whether he was kicked off, he had seven others lined up with him for conviction in any event. It is obvious that he had been discussing this case, it is obvious not only that he was biased, but that he was poisoning the minds of the other jurors." To this the court answered: "That is not the proper way of raising this matter * * * if you care to raise that matter before some other judge you may do so; I am not going into it any further now. * * * I don't think this is the proper way of raising this question. * * * I will say this, Mr. Noonan: I have nothing before me to justify me in any way disturbing this verdict or the judgment which I have rendered on that verdict." None of the defendants thereafter made any motion either before the trial judge, or before any of the other judges of the district after he had left the district to which he had been only temporarily assigned. Thus it appears that before the jury went out the judge had complied with the only request made—substitution of an alternate—and that after verdict no motion was ever made which he, or any other judge, could properly have entertained; for it cannot be necessary to labor the point that the unsupported and necessarily second-hand statements of the defendant's attorney were no basis for judicial action.

 The competency of Stanton's written confession and the propriety of its admission in a trial in which he was joined with Gottfried and Forman, depend upon the following facts. Some time before the

---

[10] Steers v. United States, 6 Cir., 192 F. 1, 4; Needham v. United States, 7 Cir., 73 F.2d 1, 2.

trial came on, Stanton had been convicted of the unlawful sale of gasoline coupons, and was serving a term in a federal prison in Danbury, Connecticut. On June 6, 1945, eight months before the trial came on, the prosecution, upon a writ of habeas corpus ad testificandum, brought him to New York, where he was kept in the Federal House of Detention in this city, for sixteen days, after which he was returned to Danbury on the 22nd. The prosecution first brought him to the office of the District Attorney in this city, where he was questioned at length, but where he claimed his privilege and refused to answer. On the 8th day he was taken before the grand jury, where he did the same; as he also did on the 11th when he was questioned a second time by the District Attorney.

On the 14th he was allowed an interview with his wife, after which on the 16th he announced that he was ready to talk, and made and signed a written confession, the substance of which was that Forman told him that he wished Gottfried, Long and the company to be protected, and that he, Stanton, should report that the company had not filed a false sugar statement. The reason Forman gave Stanton for doing this was "that Gottfried had substantial financial resources and he (Forman) would undoubtedly get a sizeable fee and would take care of me at a later date." The confession went on to say that, in conformity with these instructions, he did go to the factory and added up on a machine the amounts of the purchase of sugar as Long gave them to him; but that he did not intend to make any real investigation whatever; but merely to exonerate the company in a report he was to submit. After he had made such a report, Forman gave him $200 out of the $500 which Forman said Gottfried had paid him.

Out of the presence of the jury the judge heard the testimony of witnesses on both sides as to the circumstances under which this confession had been obtained. According to the prosecution's witnesses he had asked whether he might see his wife in order to find whether Forman had been taking care of her while he, Stanton, had been in prison in Danbury; and he had said, that, if he should find that Forman had not done so, he would tell everything. After

seeing his wife, he said that she had told him that Forman had not taken care of her, and that she had advised him that he had better do what was best for himself. Upon all the testimony the judge found as follows: "I hold that Stanton's statement of June 16th was voluntary * * * I reached this conclusion after hearing the evidence and observing the demeanor of the various witnesses. The statement of June 16th was not obtained by duress. If there was any duress or coercion between June 6th and June 14th, which I do not find to have existed, there was sufficient time elapsing between June 14th and June 16th to dispel any continuing effect of such duress, * * *. * * * after talking to his wife he was given ample time to think the matter over and then voluntarily decided whether he wanted to make a statement. And the evidence shows that he changed his mind about that matter of making a statement, and the evidence shows why he changed his mind after talking to his wife. The statement itself shows that Stanton not only answered questions propounded to him but volunteered much that was not asked. And much of what was volunteered bears on why he changed his mind after talking to his wife."

It might be questioned whether, even before he saw his wife, Stanton had been subjected to a coercion which would have invalidated any confession then obtained. The evidence is not very convincing in print, and apparently it was not when given in court; for he was already in prison in Danbury, whither he was to be returned in any event. The basis for the supposed coercion was that detention in the New York House of Detention was much more unpleasant than in Danbury; and that he had been threatened with denial of any parole and with removal to Leavenworth. We are as sceptical of this as was the judge who heard the testimony; but we need not rest upon his disbelief, or our own doubts. Whatever the original pressure on him, the probabilities all combine to support the judge's conclusion that it was only a desire to retaliate on Forman for the neglect of his wife that in the end prevailed upon him to confess. Indeed an interval of six or even three days might have been enough

to break the effect of any preceding pressure; a few hours was so held in Lyons v. State of Oklahoma;[11] and in United States v. Bayer,[12] although the interval was far greater than here, the court held that the effect had worn off of immensely severer treatment, than can possibly be conjured out of the circumstances at bar. Whether a confession is voluntary depends upon the facts that surround it, and the judge's decision is final as to its competence except in those cases, of which certainly this is not one, in which his finding of fact is plainly untenable. What use the jury makes of the same evidence, when it is repeated at the trial, is another question which does not arise here.

■ The propriety of admitting a confession or an admission of one of the accused upon a trial of him and others has come up again and again; and, if the customary caution is given that it must be considered only against the declarant (here that caution was several times repeated), the courts have nearly always held that its reception is not erroneous against the others.[13] Nobody can indeed fail to doubt whether the caution is effective, or whether usually the practical result it not to let in hearsay. However, hearsay is admissible in all sorts of situations when the truth is not otherwise available, and the fact that this may be another exception is not conclusive against it. As we said in Nash v. United States, supra:[14] "In effect * * * the rule probably furthers, rather than impedes, the search for truth, and this perhaps excuses the device which satisfies form while it violates substance." In Anderson v. United States,[15] the confession had itself been unlawfully obtained, and was incompetent against the declarant; for that reason its admission resulted in a mistrial of the other accused. Hale v. United States,[16] was a prosecution for murder, and United States v. Haupt,[17] was for treason; both are capital offences as to which the law has always had especial solicitude; and both are atypical. They do indeed show that there may be situations in which it is the price of a joint trial that evidence, competent against only one of the accused, must not be used; but, like most of the conduct of a trial, criminal as well as civil, the admission of evidence should, as far as possible, lie in the discretion of the trial judge, for whose fairness and moderation nothing can ever be a substitute. This is a peculiar instance of the kind where his judgment should be final.

■ Next is the objection that, when Stanton was on the stand, the judge allowed him to be cross-examined as to why he had claimed his privilege, when he was questioned by the District Attorney and before the grand jury. We have three times passed upon that question,[18] and have nothing to add to the reasons we then gave. Indeed, we understand that the defendants raise the question now only to avoid the charge that by failing to do so, they have abandoned it.

■ Last is the question of the statute of limitations. The indictment for making the fraudulent statement was filed on January 28, 1946, more than three years after the crime had been committed—April 29th, 1942—; and, was concededly barred unless the Act of 1942, as amended in 1944,[19] extended the time. That act provided that in three classes of crimes the prosecution should not be barred, until three years after hostilities had ended; and of these three the first was those "involving defrauding

[11] 322 U.S. 596, 64 S.Ct. 1208, 88 L. Ed. 1481.

[12] 331 U.S. 532, 543, 67 S.Ct. 1394.

[13] Randazzo v. United States, 8 Cir., 300 F. 794, 796; Van Riper v. United States, 2 Cir., 13 F.2d 961, 967; Gibson v. United States, 9 Cir., 31 F.2d 19, 22; Cochran v. United States, 8 Cir., 41 F.2d 193, 206; Nash v. United States, 2 Cir., 54 F.2d 1006; Moore v. United States, 10 Cir., 56 F.2d 794, 796; Kaiser v. United States, 8 Cir., 60 F.2d 410, 413; Rich v. United States, 1 Cir., 62 F.2d 638, 640; Metzler v. United States, 9 Cir., 64 F.2d 203, 206; Oras v. United States, 9 Cir., 67 F.2d 463; United States v. Franklin, 2 Cir., 81 F.2d 56, 59; Auerbach v. United States, 6 Cir., 136 F.2d 882, 885.

[14] 2 Cir., 54 F.2d 1006, 1007.

[15] 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829.

[16] 8 Cir., 25 F.2d 430.

[17] 7 Cir., 136 F.2d 661.

[18] United States v. Mortimer, 2 Cir., 118 F.2d 266; United States v. Groves, 2 Cir., 122 F.2d 87; United States v. Klinger, 2 Cir., 136 F.2d 677.

[19] § 590a, Title 18 U.S.C.A.

or attempts to defraud the United States or any agency thereof." The argument—drawn from the Congressional debates—is that this language should be confined to frauds of those who contracted with the United States or supplied it with materials, and that it does not include interference even though fraudulent which results in no pecuniary loss. Textually this reasoning has nothing to commend it, except so far as the word. "fraud," may imply pecuniary loss; and, whatever might be said as a new matter for so circumscribing that word, it has been the law, at least since 1910, that in the statute[20] under which this indictment was drawn, "fraud" includes any conduct, "calculated to obstruct or impair its" (the United States') "efficiency and destroy the value of its operations and reports."[21] We see no reason for reading the words, "defrauding the United States" in the statute of limitations now in question less comprehensively; certainly there was not enough ground for that in the debates of Congress. Besides, the purpose of the amendment was not to let crimes pass unpunished which had been committed in the hurly-burly of war, an overriding motive which perfectly fits the situation at bar.

■■■■ An appeal in misericordiam has been made to us, both upon the argument and in the briefs, based upon the severity of the sentences— three years for Gottfried and one year for Forman—in the face of the jury's recommendation of "utmost clemency." We have of course no control over sentences, nor should we now so much as allude to them, were it not for this effort. That, however, makes it not improper to say that we can see nothing to justify the jury's recommendation, and especially not the mawkish and sentimental impertinence which one of the jurors addressed to the judge. While the Nation was at grips with its most deadly enemy and in peril of its very existence, these men combined to frustrate it in the equitable distribution of a staple, necessary to its defence. That was in effect, though of course not in law, aid and comfort to the enemy; and if severity is ever proper, we cannot imagine a better occasion for its exercise than upon those whose greed led them to such scurvy disloyalty.

Convictions affirmed.

---

[20] § 80, Title 18 U.S.C.A.

[21] Haas v. Henkel, 216 U.S. 462, 479, 30 S.Ct. 249, 254, 54 L.Ed. 569, 17 Ann. Cas. 1112.